STROH DIE CASTING COMPANY, INC., Plaintiff-
Respondent-Cross Appellant,†

v.

MONSANTO COMPANY, Defendant-Appellant-Cross
Respondent.

Court of Appeals

*No. 91–2240. Oral argument November 25, 1992.—Decided
May 7, 1993.*

(Also reported in 502 N.W.2d 132.)

†Petition to review denied.

92

94

For the defendant-appellant-cross respondent the cause was submitted on the briefs of *Borgelt, Powell, Peterson & Frauen, S.C.,* by *Joseph D. McDevitt,* of Milwaukee, and *Kirkland & Ellis* by *Andrew R. Running,* of Chicago, Illinois.

For the plaintiff-respondent-cross appellant the cause was submitted on the briefs of *Riordan, Crivello, Carlson, Mentkowski & Steeves, S.C.* by *Donald H. Carlson* and *John R. Pendergast, Jr.,* of Milwaukee.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

WEDEMEYER, P.J.   Monsanto Company (Monsanto) appeals from a final judgment entered on August 9, 1991, following a jury trial in the circuit court for Milwaukee County, awarding Stroh Die Casting Company, Inc. (Stroh) $6,081,014.69 in damages for negligence and strict product liability. Monsanto asserts four claims of error: (1) Stroh's entire cause of action is time-barred; (2) the trial court erroneously exercised its discretion by allowing inadmissible and

prejudicial evidence; (3) there is insufficient evidence to support the punitive damages verdict; and (4) Stroh is not entitled to prejudgment interest and taxable costs under sec. 807.01, Stats.

Stroh cross-appeals asserting the following two claims of error: (1) the trial court erred in concluding that a portion of its cause of action was time-barred by the applicable statute of limitations; and (2) the trial court erred by granting partial summary judgment in favor of Monsanto dismissing a claim for intentional misrepresentation.

Regarding Monsanto's appeal, we conclude that Stroh's cause of action was time-barred because Stroh should have discovered its negligence and strict product liability claims prior to May 18, 1978, and, therefore, we reverse that part of the judgment awarding Stroh $6,081,014.69 in damages. Because of this conclusion, we need not address Monsanto's second, third and fourth claims of error. Regarding Stroh's cross-appeal, we conclude that the trial court, based on the applicable statutes of limitation, properly dismissed all of Stroh's claims relating to the testing and disposal of waste oil, as well as Stroh's claim for intentional misrepresentation, and, therefore, we affirm those parts of the judgment.

## I.  BACKGROUND

Stroh is a family-owned company located in Milwaukee. The company custom produces zinc and aluminum die castings. As part of its castings operations, Stroh utilizes many hydraulic systems which require hydraulic fluid sufficient to withstand the high temperatures involved in such work.

From approximately 1962 to mid-1972, Stroh purchased a fire-resistant hydraulic fluid from Monsanto

called Pydraul. During this period Pydraul was formulated with either polychlorinated biphenyls (PCBs) or polychlorinated terphenyls (PCTs).[1] These chlorinated components were utilized because of their effectiveness and resistance to high temperatures. Unfortunately, both PCBs and PCTs are toxic, persist in the environment, and tend to accumulate in the food chains of both human beings and animals.[2]

The Pydraul purchased by Stroh was utilized either to replace losses of fluid from the various die casting apparatus or to fill a new piece of equipment requiring hydraulic fluid. Although many of the machines involved in the die casting operation are technically "closed systems," there is no dispute that there were leaks in various pieces of Stroh equipment that necessitated "topping off" with hydraulic fluid. "Lost" hydraulic fluid at the Stroh plant was typically collected in floor sumps, drainage trenches, or vacuumed off the floor and then stored for off-site disposal in a 3,000-gallon holding tank. In 1980, Stroh installed a filtration system which would separate the water from Stroh's waste oil; the water would be discharged into the sanitary sewer, and the waste oil would be sold. The waste oil holding tank would accumulate sludge, which had to be removed approximately every five years.

---

[1] This case primarily concerns the polychlorinated biphenyl compounds, and we will thus refer to the contamination in terms of "PCBs". We recognize, however, that some of the contamination may have been caused by the polychlorinated terphenyls.

[2] For a discussion of the history of polychlorinated compounds, see generally *Environmental Defense Fund v. EPA*, 598 F.2d 62, 65–74 (D.C. Cir. 1978).

In April of 1981, waste sludge from Stroh's 3,000-gallon waste oil holding tank was tested for PCBs by the potential hauler of the waste—Waste Management of Germantown, Wisconsin. That testing, as well as subsequent testing, revealed unacceptable levels of PCBs in Stroh's waste oil, die casting machines, and at an outfall where water was discharged-outfall 001.[3] The EPA and the DNR were contacted. As a result, the DNR and Stroh devised a remediation program which required the removal of contaminated soil from the Stroh plant grounds, and the removal of PCBs from Stroh's die casting machines and trim presses.

On May 18, 1984, Stroh brought suit against Monsanto alleging: (1) Monsanto manufactured and sold a defective and unreasonably dangerous product; and (2) Monsanto was negligent in manufacturing and marketing a hydraulic fluid containing PCBs which it knew or should have known constituted a health hazard. Stroh sought compensation for property damage, economic loss, and related expenses in the amount of $250,000. Stroh later amended its pleadings to state a claim for punitive damages and intentional misrepresentation based on Monsanto's representations that Pydraul was safe for use as a hydraulic fluid, and on Monsanto's failure to warn Stroh regarding the presence of PCBs in the fluid.

After a lengthy discovery process, Stroh moved for summary judgment requesting that the question of Monsanto's liability be decided as a matter of law. Monsanto countered by filing its own motion for summary judgment requesting that the court dismiss the case on

---

[3] Outfall 001 was a large ditch where wastewater from the die casting cooling system was discharged. Approximately 8,000 gallons of wastewater were discharged into this ditch daily. Outfall 001 subsequently drained into the Menominee River.

the merits. The summary judgment motions were argued together and both were rejected by Judge Clarence Parrish on May 18, 1988.

Subsequently, the case was transferred to Judge Leah M. Lampone. On July 11, 1989, Monsanto moved for summary judgment on the ground that the undisputed facts established that Stroh's cause of action was time-barred by the six year statute of limitations set forth in sec. 893.52, Stats.[4] Judge Lampone ruled: "In conclusion, this Court will grant the defense motion for summary judgment as to all claims for injury relating to the testing and disposal of waste oil, but deny the motion as to claims for cleaning the machines and soil outside the Stroh plant."

The case proceeded to trial before Judge Michael J. Barron. After five weeks of testimony, the jury concluded that Monsanto was negligent and that its hydraulic fluid, Pydraul, was defective and unreasonably dangerous. The jury found Monsanto liable for $117,316 in compensatory damages and $4,600,000 in punitive damages. The trial court also awarded prejudgment interest from the date of Stroh's settlement offer in the amount of $1,271,736.69, and double Stroh's taxable costs in the amount of $91,962. Judgment was entered against Monsanto in the amount of $6,081.014.69 on August 9, 1991.

Monsanto filed notice with this court that it intended to appeal the jury verdict. Subsequently, Stroh filed a petition for by-pass with the supreme court. *See* 809.60, Stats. The petition was denied by

---

[4] Section 893.52, Stats., reads as follows: "An action, not arising on contract, to recover damages for an injury to real or personal property shall be commenced within 6 years after the cause of action accrues or be barred, except in the case where a different period is expressly prescribed."

written order of May 6, 1992. The case was then briefed and argued in this court.

## II. DISCUSSION

### A. *Monsanto's Statute of Limitations Claim*

Monsanto argues that the trial court erred by not dismissing Stroh's entire cause of action at the summary judgment phase of the proceedings. Monsanto posits that if Stroh did not discover its injuries prior to May 18, 1978, as Stroh contends, it was because Stroh failed to comply with state and federal regulations regarding PCBs. Stroh disagrees, arguing that any failure to comply with state and federal regulations was unrelated to its discovery of damages, and that its claim accrued sometime after May 18, 1978. Alternatively, Stroh contends that there are questions of material fact which preclude summary judgment in favor of Monsanto.

### 1. Standard of review

In reviewing the grant or denial of a summary judgment motion, we are required to apply the standards set forth in sec. 802.08, Stats., just as the trial court was to apply those standards. *Voss v. City of Middleton*, 162 Wis. 2d 737, 748, 470 N.W.2d 625, 629 (1991). Section 802.08(2), Stats., states in relevant part: "[Summary judgment] shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

## 2. Governing law

In considering whether the statute of limitations precludes Stroh from bringing suit against Monsanto, we agree with both Stroh and Monsanto that the "discovery rule" is the proper framework on which to build our analysis. Thus, a consideration of the rule and its application is appropriate.

In *Hansen v. A.H. Robins, Inc.*, 113 Wis. 2d 550, 560, 335 N.W.2d 578, 583 (1983), the supreme court adopted the "discovery rule" for determining when causes of action in tort accrue: "tort claims shall accrue on the date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first."[5] *Hansen*, a products liability suit arising out of injuries allegedly caused by the defendant's "Dalkon Shield" intrauterine device, reversed a long line of

---

[5] In adopting the discovery rule for tort claims, the supreme court augmented the rule for accrual of a cause of action as first delineated in *Barry v. Minahan*, 127 Wis. 570, 107 N.W. 488 (1906). In *Barry*, the supreme court concluded that: " '[a] cause of action accrues where there exists a claim capable of present enforcement, a suable party against whom it may be enforced, and a party who has a present right to enforce it.' " *Id.* at 573, 107 N.W. at 490 (citations omitted). When all of the elements of an enforceable claim are known to a claimant, the statute of limitations period for the claim begins to run—this includes knowledge of the identity of the defendant, *see Spitler v. Dean*, 148 Wis. 2d 630, 636, 436 N.W.2d 308, 310 (1989), as well as "actual damages." *See Hennekens v. Hoerl*, 160 Wis. 2d 144, 152, 465 N.W.2d 812, 816 (1991). "Actual damage is harm that has already occurred or is reasonably certain to occur in the future." *Id.* at 152–53, 465 N.W.2d at 816. The mere possibility of a future harm is not equivalent to actual damage. *Id.* at 153, 465 N.W.2d at 816.

cases that established the accrual date for tort claims as the date of the tort causing injury. *See id.* at 557–60, 335 N.W.2d at 581–83. In holding that claims accrue on the date the injury is discovered, or in the exercise of reasonable diligence should have been discovered, the supreme court balanced the conflicting policy issues raised by statutes of limitations and concluded that "the injustice of barring meritorious claims *before the claimant knows of the injury* outweighs the threat of stale or fraudulent actions." *Id.* at 559, 335 N.W.2d at 582 (emphasis added).

The general rule of *Hansen* was amplified in *Borello v. U.S. Oil Co.*, 130 Wis. 2d 397, 388 N.W.2d 140 (1986). In *Borello*, Mary Borello had a furnace installed in her home during December 1977, by U.S. Oil. *Id.* at 400, 388 N.W.2d at 141. Shortly thereafter, Borello complained of a bad odor from the furnace. *Id.* Borello wrote to U.S. Oil stating that her previous furnace problems were aggravated by the installation of the new furnace. *Id.* Although Borello subjectively believed that the furnace was the cause of her injuries, her objective belief was not confirmed until October 1979, when her physician correctly diagnosed her symptoms as "metal fume fever"—a result of the 1977 furnace installation. *Id.* at 402–03, 388 N.W.2d at 142. On November 25, 1981, Borello brought suit against U.S. Oil. *Id.* at 403, 388 N.W.2d at 142.

■

U.S. Oil argued that Borello's action was time-barred by the statute of limitations. *See Id.* at 401, 388 N.W.2d at 141. The supreme court, however, applying the discovery rule, stated that "a legislatively approved pattern of the discovery rule dictates that a cause of action does not accrue until the nature of the injury and the cause—or at least a relationship between the event

and injury—is or ought to have been known to the claimant." *Id.* at 406–07, 388 N.W.2d at 144. Before being diagnosed with metal fume fever, Borello did not "know" that her injury was related to the defective furnace. *Id.* at 406, 388 N.W.2d at 144. Thus, the court concluded: "the statute of limitations did not commence to run against Borello's claim until she had a basis for objectively concluding that metal fume fever from a furnace installed by the U.S. Oil Company and manufactured by The Williamson Company was probably the cause of her symptoms." *Id.* at 414–15, 388 N.W.2d at 147.

Although the supreme court has stated that the discovery rule is to be applied in considering the accrual date for all tort claims, it has also noted that:

> the rule is settled in this state that the expansion of the discovery rule carries with it the requirement that the plaintiff exercise reasonable diligence, which means such diligence as the great majority of persons would use in the same or similar circumstances. *Plaintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach.*

*Spitler*, 148 Wis. 2d at 638, 436 N.W.2d at 311 (citation omitted; emphasis added). Thus, for Stroh's cause of action not to have accrued by May 18, 1978, as it argues, Stroh must not have known, or through the exercise of reasonable diligence would not have known, until May 18, that it had actual injuries, the cause of those injuries, and Monsanto's part in that cause.

103

Generally, the "date of discovery" is a question of fact for the jury. *Ford Farms v. Wisconsin Elec. Power Co.*, 145 Wis. 2d 650, 658–59, 430 N.W.2d 94, 97 (Ct. App. 1988). Where the facts are undisputed, however, the determination of the date of discovery is a question of law which we will review *de novo*. *Anderson v. Garber*, 160 Wis. 2d 389, 396, 466 N.W.2d 221, 224 (Ct. App. 1991). For our purposes here, the facts essential to our inquiry are not in dispute.

3. Applicable regulations

The undisputed facts here stand within a regulatory framework that drives our conclusion that as a matter of law Stroh should have known of its cause of action well before May 18, 1978. This regulatory framework requires explication.

On February 1, 1973, Chapter NR 101 of the Wisconsin Administrative Code became effective. Chapter NR 101 concerns reports and monitoring fees for effluents and air emissions containing industrial wastes, toxic and hazardous substances, or air contaminants. Briefly summarized, Chapter NR 101 has two purposes: (1) to require that persons discharging industrial wastes, toxic and hazardous substances, or air contaminants submit a report on these discharges in a form prescribed by the Wisconsin Department of Natural Resources (DNR); and (2) to establish an annual monitoring fee, paid by those required to file a report under the chapter, to provide for adequate field monitoring and related efforts.

Subchapter 1—"Effluent Reports"—requires those who discharge industrial wastes or toxic and hazardous substances, excepting municipalities, to file an effluent report with the DNR if they fall into one or

more of the following four reporting categories and are not classified in any of the exemption categories:[6]

(1) REPORTING CATEGORIES. (a) Reporting Category I: Persons discharging treated or untreated effluent directly to surface waters of the state.

(b) Reporting Category II: Persons discharging at least 10,000 gallons of effluent per day, one or more days during the year to a land disposal system or to a municipal sewerage system.

(c) Reporting Category III: Persons discharging less than 10,000 gallons of effluent per day to a land disposal system or municipal sewerage system, when the Department finds surveillance by the state is required to protect the environment.

---

[6] The exemption categories are as follows:

(a) Exemption Category I: Persons discharging effluents to which they have contributed none of the industrial wastes or toxic and hazardous substances listed in Table I, or have contributed none in concentrations or quantities in excess of those listed in Table I, are exempted from filing reports and paying monitoring fees on such discharges.

(b) Exemption Category II: Persons may subtract concentrations and quantities of industrial wastes or toxic and hazardous substances contained in the influent from those contained in the corresponding effluent prior to determining reporting levels and fees under these rules.

(c) Exemption Category III: All cooling water discharges except those specified in Reporting Category IV are exempted unless substances are contributed to the effluent in concentrations or quantities in excess of those listed in Table I.

(d) Exemption Category IV: Sanitary waste effluents resulting only from sanitary facilities including washrooms, toilets, and kitchens need not be reported. This exemption does not include effluents from laundromats, laundries or other commercial washing facilities.

(e) Exemption Category V: Agricultural land runoff from land used exclusively for crop production need not be reported.

Wis. Adm. Code sec. NR 101.03(2).

(d) Reporting Category IV: Persons contributing more than 1 million British Thermal units (Btu) per day, one or more days during the year, to the effluent discharged to surface waters.

Wis. Adm. Code sec. NR 101.03(1)

For purposes of subchapter 1 the DNR defines "effluent" as "any liquid discharge." Wis. Adm. Code sec. NR 101.01(1). Further, "surface waters" are defined to "include ponds, lakes and streams, but not privately owned waste water or cooling water holding ponds or waste water treatment lagoons." *See* Sec. NR 101.01(3).

Within subchapter 1, the "Register of Industrial Wastes or Toxic and Hazardous Substances" (Table I) specifically delineates those substances that must be reported. *See* Wis. Adm. Code sec. NR 101.02. Under Table I, polychlorinated biphenyls must be reported to the DNR if they are discharged with a concentration at or above .0005 mg/L.[7] Subchapter I also details the information that must be included in the reports required by NR 101.03, sets forth the due dates for the reports, and describes acceptable methods of analysis. *See* secs. NR 101.04, .05 and .06. Significantly, all persons required to file effluent reports as determined by NR 101.03 were to have filed their first annual report by June 1, 1973. Sec. NR 101.05(1).

Subchapter 3 of NR 101 lists the fees and enforcement provisions for the entire chapter. NR 101.75 requires an annual monitoring fee to be paid by each person required to report under Chapter NR 101. The

---

[7] This means that a discharger must report to the DNR if it releases an effluent that contains .0005 milligrams of polychlorinated biphenyl (or more) for every liter of liquid discharge. This ratio can also be referred to as 5 parts per billion (ppb).

annual fee includes a single $50 administrative fee, as well as additional fees for effluents as determined by the DNR and based upon the concentrations and quantities of substances discharged in relation to the fee schedule as established in Table I. *See* NR 101.75(1)(a) & (b).[8]

On February 1, 1974, Chapter NR 200 of the Wisconsin Administrative Code became effective. Chapter NR 200 sets forth the requirements for filing applications for the discharge permits required by sec. 147.02, Stats. In Wisconsin, pursuant to both state and federal law, permits are required for discharges from point sources to surface waters of the state as well as land areas where pollutants may percolate, seep or leach into the ground waters of the state. NR 200.01.[9]

---

[8] Any person failing to comply with the fee requirements of NR 101 is subject to the penalties specified in sec. 144.57, Stats. Wis. Adm. Code sec. NR 101.76(1). Further, any violators of the reporting requirements of NR 101 are subject to fines of not less than $200 nor more than $10,000 for each offense. Sec. NR 101.76(2).

[9] Under NR 200, "point source" is defined, in part, as:

[a]ny discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation or vessel or other floating craft from which pollutants may be discharged either into the waters of this state or into a publicly owned treatment works. "Point source" shall not include diffused surface drainage or any ditch or channel which serves only to intermittently drain excess surface water from rain or melting snow and is not used as a means of conveying pollutants into waters of the state.

Wis. Adm. Code sec. NR 200.02(5). "Pollutant" includes "any dredged spoil, solid waste, incinerator residue, sewage, garbage, refuse, oil, sewage sludge, munitions, chemical wastes, biological materials, radioactive substances, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial,

Chapter NR 200 is quite clear in its directive: "An application for a discharge permit shall be filed by any person who discharges any pollutant from a point source to the waters of the state unless the discharge" is subject to one of the delineated exclusions.[10] Wis. Adm. Code sec. NR 200.03(1). For all existing discharges for which a permit was required by the NR 200 regulations, a permit application was to be initially filed no later than January 17, 1974. Sec. NR 200.04(1).

Chapter NR 157 of the Wisconsin Administrative Code—"Management of PCBs and Products Containing PCBs"—became effective September 1, 1977. The foreword to NR 157 expresses the DNR's concern

---

municipal and agricultural waste discharged into water." Sec. NR 200.02(6). Finally, "waters of the state" means:

> those portions of Lake Michigan and Lake Superior within the boundaries of Wisconsin, all lakes, bays, rivers, . . . drainage systems and other surface or ground water, natural or artificial, public or private within the state . . . except those waters which are entirely confined and retained completely upon the property of a person.

Sec. NR 200.02(8).

[10] The following discharges are not subject to permitting under NR 200:

    (a)   Discharges to publicly owned treatment works;

    (b)   Sewage discharged from vessels;

    (c)   Discharges from properly functioning marine engines;

    (d)   Discharges of domestic sewage to disposal systems, such as to septic tanks and drain fields, defined as plumbing in s. 145.01 (1)(b), Wis. Stats., and subject to regulation thereunder;

    (e)   The disposal of septic tank pumpage and other domestic waste to the extent that it is regulated by chapter NR 113, Wis. Adm. Code; and

    (f)   The disposal of solid wastes, including wet or semi-liquid wastes, at a site or operation licensed pursuant to chapter NR 151, Wis. Adm. Code.

Wis. Adm. Code sec. NR 200.03(2).

regarding PCBs and the purpose of implementing regulations regarding their use:

> Concern for the disposition of polychlorinated biphenyls (PCBs) is due to the chronic toxicity of these chlorinated aromatic organic compounds, the pervasiveness and persistence in the environment, and the tendency to accumulate in food chains and man. It is the intent of these rules to provide for comprehensive management (handling, storage, transportation, processing, and disposal) of PCBs and products containing PCBs taken out of service for disposal to eliminate or minimize discharge of PCBs into the environment, and further, to establish procedures for methods and manner of sampling, preparing samples and analyzing PCBs to be used in determining the applicability of this chapter to various wastes, substances or products.

Under chapter NR 157, a "generator"[11] must handle and store PCBs and products containing PCBs in a manner that will prevent release into the environment. Wis. Adm. Code sec. NR 157.03(1). Further, before undertaking shipment for disposal of PCBs or products containing PCBs, a generator must take certain steps: (1) make provisions with a service or disposal facility to accept the PCBs or products containing PCBs; (2) transport the PCBs or products containing PCBs in self-owned and operated vehicles or by contract with a transporter licensed as a transporter of hazardous waste pursuant to Wisconsin law; (3) complete the appropriate waste tracking form in conjunction with the transporter or disposal facility; and (4) ascertain that the PCBs or products containing PCBs are pack-

---

[11] The term "generator" is defined broadly to include "any person who possesses for disposal PCBs or products containing PCBs." *See* Wis. Adm. Code sec. NR 157.02(3).

aged or stored in secure containers so as to prevent losses to the environment. Sec. NR 157.03(2)(a), (b), (c), & (d).

Chapter NR 157 also details the specifics for appropriate disposal methods and facilities. Under section NR 157.07(1), products containing PCBs for which a technically and economically feasible incineration method is available shall be incinerated unless approval for an alternative method of disposal is obtained from the DNR. Solids or semi-solid products containing PCBs for which there is no technically feasible method of incineration may be disposed of at a landfill facility. Wis. Adm. Code sec. NR 157.07(1); *see also* NR 157.07(3), (4) & (5).[12]

On the federal side, regulations issued by the United States Environmental Protection Agency (EPA) regarding the disposal and marking requirements for PCBs became effective on April 18, 1978. *See* Polychlorinated Biphenyls, Disposal and Marking, 43 Fed. Reg. 7150 (1978). These regulations were promulgated pursuant to sec. 6(e)(1) of the Toxic Substances Control Act and were designed to protect the environment from further contamination by PCBs resulting from improper handling and disposal.

In promulgating the regulations the EPA indicated that "disposal" was being defined:

---

[12] Finally, chapter 157 delineates testing methods for PCBs and products containing PCBs. Section 157.20(1) notes that simple solvent dissolution and gas chromatographic analysis shall be used to test PCBs and products containing PCBs. Significantly, section NR 157.20(1) also specifically lists dielectric fluids, *hydraulic fluids* and heat transfer fluids as being products likely to contain PCBs.

very broadly to include any action that may be related to the ultimate disposition of a PCB substance, article, or mixture. An accidental or intentional release of PCB chemical substances or mixtures to the environment, including spills, is considered to be an act of disposal. Under this regulation, proper disposal of material contaminated as a result of a spill must be performed.

Polychlorinated Biphenyls, Disposal and Marking, 43 Fed. Reg. 7150 (1978).

The disposal and marking regulations for PCBs apply "to all persons who manufacture, process, distribute in commerce, use, or dispose of PCBs." The regulations require high temperature incineration for all PCB liquids. The regulations further require that any materials contaminated by PCB liquid spills be disposed of either in an incinerator or in a chemical waste landfill. 40 C.F.R. § 761.10(2), (3), & (4).

### 4.   Application of the law to the facts

The above regulations, in concert with the undisputed facts of record, lead to the conclusion that as of May 18, 1978, Stroh knew, or in the exercise of reasonable diligence should have known, that it had suffered actual damages due to the PCB contaminated fluid sold by Monsanto.

The record clearly shows that Stroh was discharging untreated effluent directly to the "surface waters of the state" throughout the time period in question. Consequently, Stroh was subject to the requirements of NR 101. There is no dispute that Stroh's Outfall 001 discharged an effluent containing greater than 5 ppb of PCBs. Thus, Stroh had a duty to file an appropriate report by March 11, 1974, concerning the discharge of PCBs contained within its effluent. Stroh failed to file a

report until 1977. Even then, Stroh was advised by the DNR in November of 1977 that its first NR 101 report was deficient because there had been no testing for PCBs.

The record also reveals that Stroh was remiss in filing an application for a discharge permit as required by NR 200. Because Stroh discharged a pollutant from an existing point source into the waters of the state, it was to have filed an application for a discharge permit by January 17, 1974. An application form was not submitted until 1977.

Of particular relevance to this case is Stroh's disregard of NR 157. Chapter NR 157 was drafted specifically to address the problems presented by PCBs in the environment. As set forth in detail above, beginning in September 1977, NR 157 mandated that Stroh test its waste oil for PCB contamination, employ licensed waste haulers for the transport of any PCB-containing wastes, prepare detailed waste tracking forms, and arrange for the high-temperature incineration of any PCB-containing wastes at a licensed facility. Before 1981, Stroh complied with none of the NR 157 requirements.

Finally, there are no facts of record to indicate that Stroh, prior to 1981, complied with the applicable federal PCB regulations, or even made a colorable attempt to comply.

If Stroh had complied with the state and federal regulations regarding PCBs, there is no doubt that it would have discovered its injuries prior to May 18, 1978. In fact, both sides agree that compliance with the monitoring and reporting fees, as well as the disposal fees required by NR 101 and NR 157, respectively, would have cost Stroh in excess of $1,000,000—over

90% of its original claim. This is not a case where, as of May 18, 1978, Stroh only had the mere possibility of future harm. Quite the contrary, Stroh's damages were essentially complete and any further damages, i.e., replacing machinery and disposing of contaminated soil, were reasonably certain to occur in the future.[13]

This court does not accept Stroh's argument that it did not know of its PCB problems until spring 1981.

---

[13] Here, we disagree with the trial court's finding that Stroh's cause of action for the contaminated soil and machinery was not complete until November, 1979. The trial court ruled that it was not until after May, 1978 that Stroh was on notice of its claims involving the testing, cleaning and refilling of the machines, and the required cleanup of the soil surrounding the plant. The trial court based its conclusion on the following:

> NR 157 applied only to waste oil; it did not affect hydraulic fluid in use. It was not until November, 1979, that users such as Stroh were required to reduce the PCB levels of hydraulic fluids currently in use. Further, nothing in the law as of May, 1978, required the cleanup of soil outside the plant; it was not until sometime after that date that it was deemed to be contaminated.

The trial court reasoned that because Stroh's claim was based on a defective product, "whether the soil or the machines could be deemed contaminated (injured) was dependent upon the state of the law at the time . . .[,] the property was not in fact 'damaged' until the government declared it to be contaminated." Without deciding whether it was proper to "split" Stroh's claims, we conclude that the costs of cleaning and/or replacing the contaminated soil and machinery were reasonably foreseeable considering the pervasive regulatory scheme surrounding PCBs as of May 18, 1978. We conclude that these damages: (1) could have been discovered by Stroh during reasonably diligent discovery, and (2) irrespective of later PCB regulations, could have been properly brought as part of Stroh's original cause of action, had it been initiated before the statute of limitations expired.

Claimed ignorance of, and blatant failure to follow applicable regulatory rules, cannot be construed as being "reasonably diligent" in discovering an injury. Here, Stroh asks us to condone its performance in ignoring state and federal regulations.[14] We refuse. As stated by Judge Lampone in her summary judgment ruling:

> One in the position of Stroh, in a business which entails the discharge of waste products into the environment, must be held to the standard required by law. There is an affirmative duty to become informed of regulations governing discharges and waste disposal. To condone as reasonable diligence ignorance of the law, with resulting contamination to the environment, would run contrary to good public policy.

In accord with *Spitler, supra*, we conclude that plaintiffs may not close their eyes to information, which through the exercise of reasonable business practice is accessible to them and which if uncovered would alert them to injury.

---

[14] Stroh bases its ignorance, in large part, on the failure of its consultants to detect PCBs prior to 1981. Stroh also blames its ignorance on the DNR. Stroh argues that the DNR was not diligent in its efforts to oversee the implementation of NR 157, and therefore, Stroh was blameless in not discovering its PCB contamination. Both arguments, however, lack merit. First, the DNR informed Stroh in November of 1977 that its consultants had improperly neglected to test for PCBs at Outfall 001 and failed to include PCB levels in its NR 101 report. Second, irrespective of the DNR's watchdog activities, NR 157 was the law as of September 1977, and it was the duty of Stroh to comply with the law.

There is no dispute that Monsanto was the sole provider of PCB-containing fluids in the United States throughout the sixties and seventies. There is also no dispute that Stroh purchased PCB-laden hydraulic fluid from Monsanto between 1965 and 1972.[15] The only hydraulic fluid purchased by Stroh that contained

---

[15] Stroh attempts to convince this court that it was unaware of the fact that the hydraulic fluid that it purchased from Monsanto contained PCBs until mid-1981. Monsanto, on the other hand, asserts that it mailed a series of letters to Stroh in the early 1970s indicating that a variety of its hydraulic fluid brands contained PCBs. Monsanto also claims that its hydraulic fluid containers were clearly marked with a PCB warning sticker beginning in the early 1970s. At the summary judgment motion for dismissal on statute of limitations grounds, Judge Lampone concluded that there was no genuine issue as to the fact that Monsanto had indeed mailed to its customers, including Stroh, a series of letters between 1970 and 1973 "advising them of the presence of PCBs in some of its hydraulic fluids." Our review of the record reveals that Judge Lampone was correct in her conclusion that there is no genuine issue as to the fact that Stroh knew that at least a portion of the hydraulic fluids purchased from Monsanto contained PCBs. Stroh submitted no affidavits specifically denying receipt of the warning letters. Further, an October 25, 1983 letter, sent by Michael E. Stroh, Executive Vice President of Stroh at the time, to John H. Craddock, the Product & Environmental Safety Director at Monsanto, clearly indicates that in the early 1970s Stroh received "some generalized warnings about disposal of PCB's and subsequent indication that Pydraul had been withdrawn from the market." Further, our review of the record reveals no possible dispute as to the fact that Monsanto's PCB-containing hydraulic ·fluids were clearly marked with a warning label beginning in the early 1970s. The warning label stated that Pydraul 312 "[c]ontains chlorinated hydrocarbons," should not be breathed, and should not be in contact with the eyes or skin.

PCBs was that sold by Monsanto. The conclusion is thus inescapable that Monsanto was the cause of Stroh's injuries for PCB contamination. Further, the conclusion is also inescapable that Stroh should have known of Monsanto's part in that cause, i.e., the selling of the Pydraul fluid to Stroh.

In conclusion, we hold that there are no factual questions concerning the date on which Stroh should have discovered its PCB injuries and, therefore, Stroh, in the exercise of reasonable diligence, should have discovered its negligence and strict product liability claims against Monsanto prior to May 18, 1978.

### B.   Stroh's Intentional Misrepresentation Claim

Stroh's second amended complaint alleged that Monsanto falsely and fraudulently misrepresented material facts regarding its PCB-containing Pydraul product to Stroh,[16] with the intent to defraud, and that Stroh justifiably relied on those representations to its detriment.[17] The trial court, however, held that the

---

[16] Stroh's second amended complaint was filed on May 3, 1990, almost six years after the original commencement of the action. Later discovered damages or forms of relief, however, may be asserted in amended pleadings after the timely filing of the action by taking advantage of the relation-back doctrine. *See* sec. 802.09(3), Stats.

[17] Specifically, Stroh alleged that Monsanto intentionally failed to disclose the following material facts: (1) continued occupational exposure to PCB-containing products could result in permanent liver damage to Stroh's employees; (2) atmospheric concentration of PCBs in excess of one milligram per cubic meter of air was considered by Monsanto to be hazardous to human health; (3) ingestion of PCBs in excess of one part per million was considered by Monsanto to be detrimental to human

allegations of fraud by Stroh were merely incidental to its negligence and products liability claims and were barred by the statute of limitations—sec. 893.93(1)(b), Stats.

### 1. Governing law

Section 893.93(1)(b), Stats., reads:

> The following actions shall be commenced within 6 years after the cause of action accrues or be barred:
>
> . . . .
>
> (b)  An action for relief on the ground of fraud. The cause of action in such case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud.

Both parties agree that for purposes of accrual of a cause of action sounding in fraud, "it is not necessary that a defrauded party have knowledge of the ultimate fact of fraud. What is required is that it be in possession of such essential facts as will, if diligently investigated,

---

health; (4) PCBs are persistent environmental pollutants which accumulate and biomagnify in the human food chain; (5) PCBs cause adverse health and reproductive effects in fish and aquatic wildlife and are fatal to some aquatic species at low doses (5 ppb); (6) Monsanto's PCB-containing products were contaminated with highly toxic polychlorinated dibenofurans; and (7) PCBs contained in Monsanto's Pydraul could be converted to highly toxic PCDFs when incinerated at temperatures below 800 degrees Celsius. Stroh further alleged that Monsanto intentionally failed to advise Stroh that it was necessary to drain and clean its die casting machines and trim presses of all PCB- and PCT-containing fluids to avoid further damage to its property and potential injury to its employees and the environment.

117

disclose the fraud." *See Milwaukee Western Bank v. A.A. Lienemann*, 15 Wis. 2d 61, 65, 112 N.W.2d 190, 192 (1961). Therefore, the question is what essential facts did Stroh have prior to May 18, 1978, which, if diligently investigated, would have disclosed Monsanto's alleged fraud.

## 2.  Application of the law to the facts

The "facts constituting the fraud" in this case stem from a February 28, 1972 letter from Monsanto to Stroh, promotional materials regarding the Pydraul fluids, and statements made by sales representatives of Monsanto to Stroh personnel. The February 28 letter indicated that all Pydraul fluids were being reformulated to remove all chlorinated components and that the "new Pydraul products will be compatible with the present formulations and no draining, cleaning or changing of seals in your systems is necessary." The promotional material allegedly failed to disclose material facts known to Monsanto concerning the continued use of PCB-containing products. Finally, the Monsanto sales representatives allegedly failed to disclose the problems associated with PCB-containing products, as well as the necessity for Stroh to drain and clean any die casting or trim press which had utilized PCB-containing products.

With the enactment of NR 157 in September 1977, Stroh was obligated to incur substantial expenses for PCB testing and incineration because of its continued use of PCB-containing hydraulic fluids. NR 157 also alerted Stroh to the pervasiveness and persistence of PCB-containing products in the environment. Further, Stroh itself noted that the problems associated with PCB-containing products were creating tremendous

public outcry throughout the mid-1970s. As of September 1977, a conscientious enterprise in the position of Stroh should have become suspicious of Monsanto's allegation that its Pydraul fluids could continue to be used in Stroh's die casting operation. We conclude that if Stroh had diligently investigated the facts known to it as of September 1977, the alleged fraud on the part of Monsanto would have been discovered. Consequently, Stroh's intentional misrepresentation claim is time barred under sec. 893.93(1)(b), Stats.[18]

## III. CONCLUSION

We conclude that Stroh, in the exercise of reasonable diligence, should have discovered its negligence and strict liability claims against Monsanto prior to May 18, 1978. We reach this conclusion based on our

---

[18] Stroh directs our attention to *Nevada Power Co. v. Monsanto Co.,* 955 F.2d 1304 (9th Cir. 1992) for the proposition that notice of the defendant's fraudulent intent is required to accrue a fraud action. *Nevada Power* is also a case involving PCB contamination where the plaintiff alleged that Monsanto's conduct was fraudulent. The court held that it would be inequitable to hold that Nevada Power's fraud claim accrued at the same time as its negligence claim:

> [I]n those cases where, even with knowledge of the facts of a negligence claim, proper diligence could not uncover the facts regarding state of mind needed for a fraud claim, it would be unduly harsh and inequitable to hold that the fraud action always accrues at the time of the negligence action.

*Id.* at 1309. Although we agree with the ninth circuit's basic premise "that a party should be allowed an appropriate amount of time to discover the alleged fraud—we note that sec. 893.93 (1)(b), Stats., allows six years to discover the "facts constituting the fraud," not "the facts regarding state of mind needed for a fraud claim." We thus conclude that *Nevada Power* is inapplicable to the case at bar.

determination that under sec. 802.08(2), Stats., there are no material issues of fact surrounding the date of discovery for Stroh's claims. We further conclude that Stroh's intentional misrepresentation cause of action is time-barred by sec. 893.93(1)(b), Stats. Thus, the case is remanded to the trial court with directions to enter judgment in favor of Monsanto dismissing the entire cause of action.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.