In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-3678

KDC FOODS, INC.,

*Plaintiff-Appellant*,

*v.*

GRAY, PLANT, MOOTY, MOOTY & BENNETT, P.A., et al.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:12-cv-00636-bbc — **Barbara B. Crabb**, *Judge*.

ARGUED APRIL 1, 2014 — DECIDED AUGUST 15, 2014

Before TINDER and HAMILTON, *Circuit Judges,* and
KAPALA, *District Judge*.*

TINDER, *Circuit Judge*. This case is brought by the estate of
a bankrupt corporation, KDC Foods, Inc., against former
outside counsel Gray, Plant, Mooty, Mooty & Bennett P.A.

---

* The Honorable Frederick J. Kapala of the United States District Court
for the Northern District of Illinois, sitting by designation.

("GPM" or "Gray Plant") and three current or former GPM attorneys, Daniel Tenenbaum, Phillip Bohl, and Jennifer Dasari. Plaintiff-Appellant KDC alleges that the law firm and its attorneys were complicit in an insider conspiracy to bankrupt the company. The district court granted summary judgment against KDC on the grounds that its claims were barred by the statute of limitations. KDC appeals that judgment to our court.

## I

In reviewing a grant of summary judgment, we construe all facts and draw all reasonable inferences in favor of the non-moving party. *Phillips v. Cont'l Tire The Americas, LLC*, 743 F.3d 475, 477 (7th Cir. 2014). The facts here are thus recounted in the light most favorable to KDC. "We do not vouch for their truth in any other sense." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 673 (7th Cir. 2012).

### A. Engagement and Resignation of GPM

Plaintiff-Appellant KDC Foods, Inc. was founded in 1996 in Eau Claire, Wisconsin to create and sell baking products and related manufacturing techniques. By 2004, KDC had developed various shelf-stable dough products and licensed its technologies. But despite the royalties it was receiving, KDC had cash flow problems. On March 1, 2004, KDC hired Don Johnson as its Chief Financial Officer with the expectation that he would raise capital and pursue corporate restructuring opportunities. Soon after his appointment, Johnson contacted an acquaintance, lawyer and individual Defendant-Appellee Daniel Tenenbaum, to ask whether Tenenbaum's firm, Gray Plant, would represent KDC. The law firm sent KDC an engagement letter on June 22, 2004,

which included conflict-waiver language regarding Johnson and Consolidated Interest Corporation, a company affiliated with Johnson for which GPM had done prior work. Gray Plant was ultimately retained by KDC for services relating to restructuring, intellectual property, and recapitalization matters. Unfortunately, KDC's fortunes did not improve with Johnson at the helm. On September 14, 2004, Johnson sent KDC a resignation letter, though he actually left his post on November 5, 2004. Johnson then joined another corporation, First Products, Inc., in Minnesota—but more on that later.

KDC's cash flow problems meant GPM also had difficulty getting paid, as evidenced by an October 1, 2004 letter from the firm demanding payment. More than $20,000 in fees went unpaid, and by letter on November 9, 2004, Gray Plant resigned as KDC's counsel, citing the company's "significant overdue account" with the law firm.

### B. KDC's Bankruptcy and Filing of Initial Lawsuit

Shortly thereafter, in early December 2004, KDC's board of directors voted to file for Chapter 11 bankruptcy. KDC's assets were sold at auction, and purchased by First Products, Inc. No other bids were received, and the bankruptcy court approved the sale after a hearing. After the sale, the bankruptcy was converted to a Chapter 7 liquidation proceeding. The bankruptcy trustee, James McNeilly, hired Dennis Sullivan as special counsel for the estate. Sullivan had filed a shareholder derivative action in November of 2004—just before KDC filed for bankruptcy—alleging that Harry Kraklow and Cynthia Kandler, directors and officers of KDC, had conspired to defraud the company of its intellectual property by driving KDC out of business and purchasing its assets at bargain prices. The derivative action was converted to a di-

rect action, with Sullivan pursuing the suit on behalf of KDC. We'll refer to this proceeding as "the initial lawsuit."

### C. GPM Returns KDC's Client File

As part of the initial lawsuit, on March 10, 2006, Sullivan requested that Gray Plant return to him "the complete file that you have concerning KDC Foods, Inc." He clarified that his request "includes, but is not limited to, correspondence, emails, pleadings, notes, transcripts … ." The file sent to Sullivan by GPM on April 7, 2006 contained emails, memoranda, and time records. In particular, the file contained a detailed memorandum on corporate records deficiencies prepared by Defendant-Appellee Jennifer Dasari. The file also included time records showing she had worked on the issuance of 1099 forms and stock certificates. Defendant-Appellee Phillip Bohl, a partner at GPM, had noted in his time sheets that he had emails and discussions with KDC employee Kim Myers about issuing 1099 forms for other shareholders, and the file contained records of the transmission of stock certificates to reflect the sale of KDC stock to Johnson, Kandler, and Myers at $0.01 per share. The file also contained email exchanges between Tenenbaum and Johnson, in which capitalization, financing, and debt-reduction opportunities were discussed. Notably, in a June 7, 2004 email to Tenenbaum prior to GPM's formal engagement, Johnson identified four options for the future of KDC, two of which were to "BK the company" or to "[f]orm as you suggested a new acquisition company and buy the assets." The file also included a memorandum listing ways to "handle" the shareholders with whom KDC was having trouble, including bringing claims against them for violating the confidentiality provisions of their contracts.

Sullivan noticed several gaps in the file. About a month after GPM had sent over the KDC file, he wrote to the firm that the file included "no emails from Mr. Tenenbaum's mailbox or from the mailbox of Jennifer Dasari," and requested that GPM recheck its records and produce the correspondence. On November 26, 2006, eight months after GPM had sent over its file, Sullivan requested that Gray Plant reexamine its files to locate an attachment referenced in an email. The law firm produced documents after both requests. Sullivan did not follow up with a request for handwritten notes, but those were largely absent from the file as well: only 4 pages of attorney notes were included. Gray Plant apparently has a policy to not include any handwritten attorney notes in client file transfers. (As part of the disclosures in the present action, Gray Plant produced 77 additional pages of attorney notes, as well as 47 pages of additional documents, including more emails.)

After the initial file transfer on April 7, 2006, Richard Wanke, a KDC shareholder, wrote Sullivan an email that read, in relevant part:

> Harry and Gibbs indicated that Gray Plant and Mooty appraised the stock at $0.01. I believe it was Tennenbaulm [sic]. Gee, I wonder what his credentials are? Note also that Phil Bohls [sic] denied that they appraised the stock. My gut feeling is that Tennenbalm [sic], Don's (Consolidated Interests Corporation CIC) personal attorney, said he thought Don could get away with $0.01 per share based on Don's trash talk about the company. Definitely a conflict of interest.

Wanke later testified that he was referring to Johnson's conflict of interest with the company, not to any potential conflict of interest between Tenenbaum and KDC, or GPM and KDC.

### D.  Resolution of the Initial Suit

After the initial transfer of KDC's client file, Sullivan filed an amended complaint in the initial suit on June 27, 2006, adding Johnson and First Products, Inc. as defendants, and adding charges for fraud and conspiracy. The complaint alleged that Johnson and others had conspired to issue additional voting shares to seize control of KDC, and steal its assets and corporate opportunities and redirect them to First Products, Inc. An element of this conspiracy, the complaint alleged, was the pressuring of Stanley Popko, a stockholder "unfriendly" to the conspiracy, to return his KDC stock by threatening to have the company issue a Form 1099 to Popko based on a valuation of one dollar per share. This valuation was much higher than Popko's basis in the stock, and would have resulted in significant tax liability to him.

In September 2008, KDC deposed Bohl and Tenenbaum as part of the initial lawsuit. During their depositions, Bohl and Tenenbaum testified that in March 2007, Gray Plant had been engaged by First Products, Inc. in matters unrelated to the pending suit. The firm had not contacted either company to obtain a waiver of conflict for this representation. GPM received more than $80,000 in legal fees for its representation of First Products, Inc. These payments were pursuant to the law firm's typical rates, for services rendered.

In January 2010, a Wisconsin state judge entered judgment in the initial lawsuit, finding some of the defendants,

including Johnson, had engaged in a civil conspiracy to de-fraud KDC and steal its assets.

### E. Commencement of Suit against GPM

In July 2011, KDC's bankruptcy trustee, McNeilly, was contacted by attorney Michael Erhard, who had been re-tained by KDC to review the plausibility of pursuing claims against Gray Plant. In an email exchange discussing the po-tential suit, Erhard wrote that "[a]s it pertains to the applica-ble statute of limitations, we calculate that if at all possible the suit against Gray, Plant, Mooty should be filed by no lat-er than the end of August [2011]." Six months later, on March 26, 2012, Erhard wrote to Gray Plant enclosing a draft complaint and offering to settle the case for the payment of $6,000,000. The demand letter noted that "[KDC] only learned of Gray Plant Mooty's role in the conspiracy in 2007 [sic—the depositions were in 2008], when Attorneys Tenen-baum and Bohl were deposed." The demand letter did not lead to settlement, and KDC commenced the present action on July 31, 2012.

### F. Disposition Below

KDC brought seven claims against GPM, alleging that GPM was involved in the scheme to defraud KDC of its as-sets orchestrated by Johnson. KDC eventually abandoned four of its seven original claims. The three claims the com-pany still pursues are for (1) common-law fraud, (2) conspir-acy to commit theft by fraud, and (3) civil conspiracy. In support of these claims, KDC alleges that GPM falsely repre-sented that it would act in KDC's best interests as its corpo-rate counsel, but instead assisted Johnson in driving KDC

out of business so that its assets could be acquired by First Products, Inc.

During discovery, GPM produced an additional 77 pages of handwritten notes relating to its representation of KDC. In addition, when Tenenbaum was deposed in relation to the present case on May 21, 2013, GPM produced additional documents, including emails between Johnson and Tenenbaum that it had not previously provided to KDC. In one newly revealed email exchange, which occurred on November 5, 2004, Tenenbaum told Johnson that GPM was going to withdraw "for all of the reasons we discussed," and Johnson responded that if something were to go wrong with the KDC dissolution, "it will be hard to come to your firm later."

On summary judgment, the district court determined that the three remaining claims were barred by the six-year statute of limitations found in Wis. Stat. § 893.93(1)(b), because KDC was on notice of GPM's alleged fraud by April 2006, when Sullivan received KDC's client file. On appeal, KDC argues that the documents it received in April 2006 were insufficient to alert it to GPM's fraud and that it did not have reason to suspect that fraud until the attorney depositions in September 2008, when it learned that GPM had been engaged by First Products, Inc. and therefore had a motive to help Johnson with his scheme. KDC further argues that GPM should be estopped from asserting the statute of limitations defense because it wrongly withheld information from KDC that would have led to earlier discovery of the fraud.

## II

In reviewing a grant of summary judgment, we review legal questions *de novo. See Phillips*, 743 F.3d at 477. Determining which statute of limitations applies to a particular claim is a question of law, *Estate of Hegarty ex rel. Hegarty v. Beuchaine*, 638 N.W.2d 355, 361 (Wis. 2001), so we review *de novo* the district court's determination that the statute of limitations had run on KDC's three remaining claims: (1) common-law fraud, (2) conspiracy to commit theft by fraud, and (3) civil conspiracy.

The parties agree that the fraud and civil conspiracy claims are governed by the six-year statute of limitations in Wis. Stat. § 893.93(1)(b), which applies to any "action for relief on the ground of fraud." GPM contends that the claim of conspiracy to commit theft by fraud should be governed by the two-year statute of limitations in Wis. Stat. § 893.57, which applies to any "action to recover damages for libel, slander, assault, battery, invasion of privacy, false imprisonment or other intentional tort to the person."[1] Theft by fraud is a crime under Wis. Stat. § 943.20(1)(d). However, under Wis. Stat. § 895.446(1), a "person who suffers damage or loss by reason of intentional conduct" prohibited by § 943.20 may bring a civil action for damages. GPM contends such a claim is based on an intentional tort and should there-

---

[1] Effective February 26, 2010, the limitations period in § 893.57 was changed from two to three years. However, the amendment explicitly stated that it was to apply only to injuries occurring after its effective date. Because the parties agree that KDC's injuries occurred prior to February 26, 2010, if § 893.57 applies to KDC's theft-by-fraud claim, the limitations period is two years.

fore be governed by the two-year statute of limitations in
§ 893.57. The Wisconsin courts have not addressed this issue,
and the district court declined to reach it because it found
that KDC's claim was untimely even assuming a more for-
giving six-year statute of limitations applied. We agree with
the district court that this question is irrelevant if we find
that KDC's claims are untimely even with a six-year statute
of limitations. We thus proceed to the main question in this
appeal: when a six-year statute of limitations would have
begun to run. KDC contends that its claims are not barred by
the statute of limitations for two reasons: first, it claims that
under the discovery rule, its claims did not accrue until the
Bohl and Tenenbaum depositions in 2008, when it first
learned that Gray Plant had been retained by First Products,
Inc. and thus had a financial incentive to assist in the con-
spiracy. Second, it argues that the doctrine of equitable es-
toppel bars defendants from asserting the statute of limita-
tions defense. We consider these arguments in turn.

### A. Discovery Rule

KDC filed the present action on July 31, 2012; its suit
would be barred by a six-year statute of limitations if its
fraud-based claims accrued before July 31, 2006. While for
some types of injuries a claim accrues at the time of injury,
the so-called discovery rule tolls the statute of limitations by
requiring that a claim accrue when a plaintiff "discovers"
the injury. In Wisconsin, the discovery rule for claims based
on fraud is created by statute. Wis. Stat. § 893.93(1)(b) pro-
vides that claims based on fraud do not accrue "until the
discovery, by the aggrieved party, of the facts constituting
the fraud." This statutory provision "codifies the discovery
rule," which is judicially explained as follows:

> Actual and complete knowledge of the fraud on the part of the plaintiff is not necessary in order to set the limitation period running.
>
> When the information brought home to the aggrieved party is such as to indicate where the facts constituting the fraud can be effectually discovered upon diligent inquiry, it is the duty of such party to make the inquiry, and if he fails to do so within a reasonable time he is, nevertheless, chargeable with notice of all facts to which such inquiry might have led. …
>
> [I]t is not necessary that a defrauded party have knowledge of the ultimate fact of fraud. What is required is that it be in possession of such essential facts as will, if diligently investigated, disclose the fraud. The burden of diligent inquiry is upon the defrauded party as soon as he has such information as indicates where the facts constituting the fraud can be discovered.

*John Doe 1 v. Archdiocese of Milwaukee*, 734 N.W.2d 827, 843 (Wis. 2007) (quoting *Koehler v. Haechler*, 133 N.W.2d 730, 731–32 (Wis. 1965), to explain the discovery rule as codified in § 893.93(1)(b)).

"Discovery occurs when the plaintiff has information that would constitute the basis for an objective belief as to his or her injury and its cause." *Schmidt v. N. States Power Co.*, 742 N.W.2d 294, 304 (Wis. 2007). As soon as the defrauded party has "sufficient knowledge to make a reasonable person aware of the need for diligent investigation," the

clock begins to run. *Stockman v. LaCroix*, 790 F.2d 584, 588 (7th Cir. 1986) (quoting *Gygi v. Guest*, 344 N.W.2d 214, 215 (Wis. App. 1984)) (internal quotation marks omitted). This, as we will see, is the critical point of law on which the case turns: regardless of how Sullivan and KDC decided to structure their investigation into the alleged conspiracy, the statute of limitations began to run as soon as KDC had in its possession knowledge that would cause a *reasonable person* to think that a diligent investigation into Gray Plant was necessary. If KDC had in its possession knowledge that would have caused a reasonable person to undertake a deeper inquiry, but it chose not to act upon that information, that inaction does not push back the time of discovery: a plaintiff's "decision not to pursue a legal avenue that might have produced useful information is not evidence of reasonable diligence." *Dakin v. Marciniak*, 695 N.W.2d 867, 874 (Wis. App. 2005).

To be sure, the degree of certainty that constitutes sufficient knowledge is variable, depending on the particular facts and circumstances of the plaintiff. *See Goff v. Seldera*, 550 N.W.2d 144, 149 (Wis. App. 1996). "[I]n an appropriate case, an initial suspicion may trigger the discovery or the obligation to exercise reasonable diligence to discover the injury. However, in another case, a greater degree of certainty may be required. The point is that every case must be judged on its own facts from the standpoint of the reasonable person." *Id.* In *Goff*, for example, the plaintiff was a patient who sued a doctor for medical malpractice. The injury in question was an unnecessary hysterectomy for ovarian cancer that did not exist; the defendant was the doctor who performed the surgery and treated the plaintiff's "cancer" for many years. The discovery rule in this case was complicated by the

question of when a lay patient can be expected to discover that contrary to her physician's representations, she does not actually have cancer. Likewise, in the context of a parishioner suing a diocese after being sexually molested by a priest, the Wisconsin Supreme Court reasoned that "it does not follow from the fact of being sexually molested that any plaintiff would suspect that the Archdiocese knew that the priests had prior histories of sexual molestation of children and yet placed them in the position where they would molest more children." *Doe*, 734 N.W.2d at 844. As *Doe* observes, it is particularly necessary for the discovery rule to be flexible in departures from the "business context." *Id.* at 844.

However, with corporate players, a different quantum of expertise and knowledge is in play. Wisconsin courts have recognized that ignorance is a less compelling excuse for corporate enterprises in the context of the discovery rule. *See, e.g.*, *Stroh Die Casting Co. v. Monsanto Co.*, 502 N.W.2d 132, 141 (Wis. App. 1993) ("[P]laintiffs may not close their eyes to information, which through the exercise of reasonable business practice is accessible to them and which if uncovered would alert them to injury."). In the case at hand, both parties are experienced corporate players. KDC does not argue, nor do we observe, that it lacked sophistication and knowledge in the context of the financial dealings in question. To the contrary, the corporation has been immersed in litigation of this conspiracy for many years, and in the process has pursued several defendants who held positions of trust in relation to the company. Its eyes were open to the possibility of fraud committed by its fiduciaries and agents. Accordingly, we do not find that the circumstances justified a more forgiving application of the discovery rule to KDC. KDC did not require "a greater degree of certainty"

than "initial suspicion" to trigger discovery of its alleged injury, and it certainly was not required to be convinced that actual fraud had occurred, as KDC argues in its briefs.

So the question is when a reasonable corporate actor would have had enough knowledge to think an investigation was necessary. The district court concluded, and we agree, that it is clear that KDC gained this knowledge when Sullivan received the initial version of the KDC client file from GPM in 2006. The file disclosed information that rooted the allegations KDC decided to pursue against Gray Plant. It highlighted that the law firm had a preexisting relationship with Johnson, and unambiguously showed that Johnson and Tenenbaum discussed the possibility of Johnson forming his own company and purchasing KDC's assets. There is even an internal email, from Tenenbaum to Dasari, indicating that Johnson discussed with Tenenbaum the potential of working with Johnson in the future after someone else assumed KDC's note. The time records and work product disclosed in the client file showed that GPM attorneys were intimately involved in financing issues, and particularly in the transactions that formed the central axis of the conspiracy: preparing 1099 forms for KDC employees, including Popko; evaluating options to quell dissent from unfriendly shareholders; and, critically, the insider penny stock sale. And as can be seen from the Wanke email shortly after the production of the file, there was at least some suspicion that Gray Plant— which had a prior relationship with defendant Johnson as his "personal attorney"—would be complicit in Johnson's activities of defrauding the company.

These data points would have been cognizable to KDC by June 2006, when it filed its amended complaint in the ini-

tial suit and alleged with specificity the activities undertaken by the conspirators. The amended complaint details the penny stock sale; the threat to issue Stan Popko a Form 1099; and the plan to bankrupt the company and purchase its assets at a discount price. So KDC, by June 2006 at the latest, was aware that Gray Plant had done work for several central components of the conspiracy. This was, unambiguously, enough information to trigger KDC's discovery that Gray Plant may have defrauded KDC. While these documents perhaps did not disclose the full extent of Gray Plant's involvement with Johnson—and while later-produced documents may have helped KDC flesh out its theory against the law firm—that does not toll the statute of limitations. The file, viewed on its own, gave KDC enough information to suspect that GPM was a central player in the events in question.

KDC urges us to rely on language found in *O'Dell v. Burnham*, 21 N.W. 635 (Wis. 1884), which states that the statute of limitations begins to run only with "[t]he discovery, or the information which, upon diligent inquiry, would lead to the discovery, of facts … as would impress a reasonable person with the belief that the transaction was, in fact, fraudulent." *Id.* at 639. It argues that this language underscores that the statute of limitations does not begin to run until a plaintiff has objective evidence of the defendant's specific role in the fraud. By KDC's account, the statute of limitations did not begin to run until KDC deposed the GPM attorneys in 2008, and thereby learned that Gray Plant was representing First Products, Inc. in matters unrelated to the present litigation. They argue that only then did KDC have reason to suspect that the law firm was not merely a passive player, or even a creditor who lost out on representation fees from the

company's bankruptcy, but rather a potential conspirator who stood to gain from Johnson's cohort's fraud and conspiracy.

There are two problems with this argument. First, *O'Dell* does not stand for the proposition that a plaintiff must have more knowledge than that which would prompt a reasonable person to inquire further into the alleged fraud. The Wisconsin courts—in over a hundred years of interpreting *O'Dell* and the discovery rule—have been clear that "actual and complete knowledge of the fraud on the part of the plaintiff is not necessary in order to set the limitation period running." *Doe*, 734 N.W.2d at 843 (quoting *Koehler*, 133 N.W.2d at 731). It is well-understood that Wisconsin courts impute knowledge to a party when it "finds out enough to cause a reasonable [party] to make sufficient inquiries to discover a fraud." *Owen v. Wangerin*, 985 F.2d 312, 315 (7th Cir. 1993) (interpreting Wisconsin law). No law supports KDC's assertion that financial motive was a required element to trigger discovery. As we state above, the knowledge that KDC had prior to the deposition was enough to cause a reasonable party to make a further inquiry: KDC knew about GPM's preexisting relationship with Johnson (including the fact that Johnson and the law firm had discussed the very possibility of bankrupting the company and using another company to purchase KDC assets), as well as the law firm's involvement in the key transactions that Johnson and the other defendants used to defraud the company. Evidence of Gray Plant's financial incentive to assist Johnson, while perhaps helpful to proving the ultimate fact of fraud, was not required to trigger the discovery. The client file, standing alone, should have been enough to cause KDC to make a deeper investigation into any alleged fraud by GPM.

Second, we are not convinced that the fact of GPM's representation of First Products raised any novel "objective evidence" of fraud. KDC argues that we should draw from Gray Plant's representation the inference that the law firm had a vested financial interest in the success of the conspirators' schemes. However, this does not seem to us a reasonable inference: the record below shows, and KDC does not dispute, that GPM received reasonable attorney fees in relation to its representation, nothing more. By arguing that the representation of First Products was a smoking gun, KDC would have us conclude that it is reasonably inferable that a law firm would undertake a fraud and conspiracy of its former client in order to receive payment for services rendered at its established rate. But "[a] motion for summary judgment requires the court to consider only reasonable inferences, not every conceivable inference." *Box v. A & P Tea Co.*, 772 F.2d 1372, 1379 (7th Cir. 1985). In the absence of additional, specific facts making this inference plausible—either an extraordinary financial boon to GPM, or some specific datum showing that Johnson conscripted Gray Plant and its attorneys as conspirators—we do not see the depositions as a turning point in KDC's knowledge. Long before the depositions, Plaintiff-Appellant already had knowledge that GPM assisted in the valuation of the stock and the penny-stock purchase, and had a preexisting relationship with Johnson. From the contents of the client file, KDC even had notice that GPM expected to receive additional work after KDC's bankruptcy, should KDC's assets be purchased by another company. The representation of First Products, Inc. does not add in a meaningful way to that reservoir of knowledge.

Accordingly, the district court was correct in determining that Plaintiff-Appellant's claims were barred by Wisconsin's statute of limitations.

## B. Estoppel

In the alternative, KDC urges that Gray Plant should be estopped from asserting a statute of limitations defense, because it withheld 77 pages of handwritten notes and several other documents that were disclosed years after the initial production of the client file, including several key emails. Under Wisconsin law, "a defendant who fraudulently conceals a conspiracy is estopped to assert the statute of limitations as a defense." *City of Madison v. Hyland, Hall & Co.*, 243 N.W.2d 422, 432 (Wis. 1976). "The aggrieved party must have failed to commence an action within the statutory period because of his or her reliance on the defendant's representations or act." *Hester v. Williams*, 345 N.W.2d 426, 431 (Wis. 1984). However, "if the defendant's behavior, whenever begun and however ill intentioned, fails to prevent the plaintiff from learning that he has a claim in time to sue within the statutory period … again the behavior has no causal significance." *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 385 (7th Cir. 2010).

We do not condone Gray Plant's errors in producing documents from the client file. As a former client, KDC was entitled to Gray Plant's prompt and accurate delivery of documents relating to the law firm's representation. *See Restatement (Third) of Law Governing Lawyers* § 46(1), (3) (2000). However, as the case comes to us, we need not reach the question of whether GPM deliberately or fraudulently withheld the documents in question: it is clear that KDC had knowledge of its cause of action against Gray Plant within

the statutory period. The law firm's behavior thus has no causal significance, and cannot estop the statute of limitations defense.

There are several clear indications that KDC had the knowledge to sue Gray Plant within the statutory period. The clearest is KDC's demand letter to GPM dated March 26, 2012, enclosing a draft complaint. It is obvious from the complaint and the letter that the company had learned of its potential cause of action by that date, which is within the six-year period calculated starting the day Sullivan received the file from Gray Plant. But even before that date, the company and its employees had sufficient knowledge to file this suit. Attorney Erhard's internal emails show that he had recognized, and alerted KDC's bankruptcy trustee, to the potential lawsuit by July 14, 2011, and even flagged the statute of limitations issue to KDC's attention. He stated that "[a]s it relates to the applicable statutes of limitations, we calculate that if at all possible the suit against Gray, Plant, Mooty should be filed by no later than the end of August [2011]." And we cannot overlook the fact that in arguing to us about the discovery rule, KDC adamantly claims that it discovered the potential fraud at the Bohl and Tenenbaum depositions in September 2008, more than three and a half years before the statutory period would run.

These representations make clear that the belated disclosures made by Gray Plant did not prevent KDC from learning of its cause of action against the law firm within the statutory period. We decline to estop Gray Plant from asserting the statute of limitations affirmative defense.

### III

For the foregoing reasons, we AFFIRM the district court's judgment.