NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued May 21, 2013
Decided July 15, 2013

**Before**

RICHARD A. POSNER, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

| | |
|---|---|
| No. 12-3163 | Appeal from the United States District Court for the Northern District of Indiana, Hammond Division |
| THE NOVOGRODER COMPANIES, INC., | |
| *Plaintiff-Appellant*, | |
| | No. 10-CV-193 |
| v. | |
| | **Robert L. Miller, Jr.**, *Judge*. |
| HARTFORD FIRE INSURANCE CO., | |
| *Defendant-Appellee*. | |

**O R D E R**

The Novogroder Companies owned a building that was vandalized and it sought payment for the damage from its insurance company.  The insurance company paid the actual cash value for the damages, and informed Novogroder that it would also pay for limited repair costs that exceeded the actual cash value.  Novogroder claims that it is entitled to this money for repairs—even though it never made any repairs.  The district court rejected Novogroder's argument on summary judgment, and we affirm.

## I.  Facts

The Novogroder Companies, Inc., ("Novogroder") is incorporated and headquartered in Indiana and owns hundreds of commercial buildings throughout the United States.  One of these buildings is located in Danville, Illinois. This building had been occupied by a Walgreens drug store, but was left vacant when Walgreens moved out around 2005. Novogroder made various attempts to sell or rent the building, but was unable to locate a buyer or lessee.

Novogroder purchased an insurance policy for the Danville building from Hartford Fire Insurance Co. ("Hartford"), a Delaware corporation with a principal place of business in Connecticut. This policy had effective dates of June 30, 2006, through June 30, 2007. Novogroder later renewed this policy through June 30, 2008.[1] Hartford agreed to reimburse Novogroder for damage to the Danville building in this policy (excerpted in Appendix A), which states: "Covered property will be valued at either Replacement Cost or Actual Cash Value . . . .  We will not pay more than your financial interest in the lost or damaged property." The Replacement Cost has two components: the Actual Cash Value, which is the value of the property at the time of loss, or an agreed or appraised value; and the Depreciation Holdback, which is the cost of repairs that exceed the Actual Cash Value. The policy further explained that Hartford would "pay on an Actual Cash Value basis until the lost or damaged property is actually repaired, rebuilt or replaced." If Novogroder repaired the building, and the actual cost of repair exceeded the Actual Cash Value, Hartford would reimburse Novogroder for the Depreciation Holdback. But if Novogroder did not "repair, replace or rebuild on the same site or another site within 2 years of the date of loss, we will pay you on an Actual Cash Value basis."

In July 2007, Novogroder learned that its Danville building had been damaged by vandalism and theft. Novogroder informed Hartford about the damage, and Hartford investigated the claim. Hartford determined that the building had been damaged on three separate occasions: the building had been vandalized and copper parts had been stolen

---

[1]  The record indicates that Hartford attempted to cancel its insurance policy with Novogroder in September 2007. Although this appears to have been a contentious issue between the parties, it does not affect the resolution of this case.

from the air conditioning on May 15, 2007; the heating and cooling system had been vandalized on May 18, 2007; and the electrical system had been damaged on June 4, 2007.[2]

Because the building remained vacant and could be vandalized again, Novogroder decided not to fully repair the building until a buyer or lessee occupied it.[3] Novogroder informed Hartford of this decision, and Hartford agreed that the repairs should wait until the building was occupied. In the meantime, Hartford calculated the full cost of repairs, and after adjusting for Novogroder's deductible, Hartford paid Novogroder $1,116,082.16 for the Actual Cash Value of the three claims. Hartford also stated that it would pay Novogroder up to $384,293.00 for the Depreciation Holdback. To claim the Depreciation Holdback, Hartford explained that Novogroder would have to file a supplemental claim "to be filed in accordance with the terms and Conditions of the Replacement Cost Coverage provided you notify us of your intent to do so within **180 days** after the date of loss . . . ." In response, Novogroder's attorney sent a letter to Hartford confirming that Novogroder was aware that it could claim the Depreciation Holdback "at the time of completion of the repairs and restoration."

After unsuccessfully trying to donate the building to a local school, Novogroder decided to donate the building to a local church that had been interested in acquiring it. Novogroder wrote to Hartford in July 2009 and asked how to donate the building to the church while contemporaneously receiving the Depreciation Holdback. Hartford responded that it would not give the Depreciation Holdback to Novogroder because "[t]here have been no repairs on the building that exceeded the actual cash value amount paid of $1,116,082.16." Additionally, Hartford stated that the insurance policy required Novogroder

---

[2] Some portions of the record indicate that the third incident of property damage occurred on July 4, instead of June 4. Nonetheless, the briefs from both parties state that the third incident occurred in June. Because both parties agree on this timeline, we assume that all three acts of property damage were covered by the insurance policy ending on June 30, 2007.  But even if the third incident of property damage occurred on July 4, 2007, Novogroder had renewed its insurance policy through June 30, 2008, and the property damage would have occurred before Hartford attempted to cancel its insurance policy with Novogroder in September 2007.

[3] The record indicates that approximately $35,000 to $40,000 had to be spent to make the building suitable for inspection, but the record is unclear whether Novogroder paid for these repairs. Even if Novogroder had paid for these repairs, they were still less than the Actual Cash Value payment that Novogroder received, and are therefore not a basis for recovering the Depreciation Holdback.

to repair the building within two years of the date of loss, and Hartford pointed out that more than two years had passed since the vandalism occurred. Novogroder reviewed its prior correspondence with Hartford and determined that Hartford had agreed to give the Depreciation Holdback to Novogroder when the repairs were made, regardless of any time limit. In reply, Hartford conceded that it had agreed to waive the 180-day time limit that it had included in its instructions on how to file a supplemental claim, but Hartford denied that it had ever waived the two-year limit in Novogroder's insurance policy. Hartford therefore refused to give Novogroder money for the Depreciation Holdback. Novogroder donated the building to the church on August 23, 2010, without making any repairs, and took a deduction for tax purposes.

On March 9, 2010, Novogroder filed a complaint against Hartford in Indiana state court, and Hartford removed the case to federal court based on diversity jurisdiction. Novogroder filed an amended complaint alleging that Hartford had breached its insurance contract by refusing to pay Novogroder the maximum Depreciation Holdback of $384,293.00. Even though the insurance contract contained the two-year limit for receiving the Depreciation Holdback, Novogroder alleged that Hartford had waived this provision and was estopped from relying on it. The complaint also requested punitive damages and attorney fees.

Hartford moved for summary judgment, and the district court granted Hartford's motion on August 21, 2012. The district court ruled that Novogroder would be unable to establish that Hartford had waived the two-year limit, and even if it could, Novogroder had failed to make any repairs that could be reimbursed by the Depreciation Holdback. Novogroder filed a timely notice of appeal.

## II. Discussion

Novogroder argues that the district court erred by granting Hartford's motion for summary judgment because Hartford waived the two-year time limit and owes Novogroder the maximum Depreciation Holdback.  We review a district court's grant of a motion for summary judgment de novo. *Good v. Univ. of Chic. Med. Ctr.*, 673 F.3d 670, 673 (7th Cir. 2012).  Additionally, we view all facts and inferences in favor of the nonmoving party (here, Novogroder).  *Id.*

The parties agree that Illinois law governs the dispute in this case. Under Illinois law, "[a]n insurance policy is a contract, and the general rules governing the interpretation of other types of contracts also govern the interpretation of insurance policies." *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005).  Courts therefore look to the parties' intentions as expressed in the policy language, and "[i]f the policy language is

unambiguous, the policy will be applied as written, unless it contravenes public policy." *Id.*

Novogroder's insurance policy contains this provision governing the availability of the Depreciation Holdback: "We will pay on an Actual Cash Value basis until the lost or damaged property is actually repaired, rebuilt or replaced." This is unambiguous, and Illinois courts have upheld similar provisions before. *See, e.g., Paluszek v. Safeco Ins. Co. of Am.*, 517 N.E.2d 565, 567-69 (Ill. App. Ct. 1990); *Higginbotham v. Am. Family Ins. Co.*, 493 N.E.2d 373, 375 (Ill. App. Ct. 1986). This provision requires Novogroder to repair the damage before receiving the Depreciation Holdback because the Depreciation Holdback only reimburses the policy holder for expenses actually incurred.

Hartford has already paid Novogroder $1,116,082.16 for the Actual Cash Value of the damage to the Danville building. Novogroder now seeks to recover the Depreciation Holdback, but it has not "actually repaired, rebuilt or replaced" the damaged building. Indeed, Novogroder is no longer able to repair the building because it has already donated the building to a local church. *See Paluszek*, 517 N.E.2d at 568 ("Property insurance is not insurance on the property itself, but rather on the interest of the person insured. Insurance coverage does not run with the property when transferred."). Because Novogroder has not, and cannot, repair the building, Novogroder has no repair costs that Hartford could reimburse through the Depreciation Holdback.

Novogroder nonetheless insists that it is entitled to the Depreciation Holdback because Hartford waived the two-year time limit and is estopped from relying on it. But this time limit does not affect the outcome of this case. Regardless of whether Hartford waived the two-year time limit or is estopped from relying on it, Novogroder still never made any repairs that could be reimbursed by the Depreciation Holdback. Accordingly, Novogroder's suit fails.

### III. Conclusion

Novogroder's insurance contract unambiguously required it to make repairs to the damaged building before collecting funds from the Depreciation Holdback. Novogroder never made any repairs, and it lost the ability to do so when it donated the building to a local church. We therefore **AFFIRM** the district court's ruling.

**APPENDIX A**

**PROPERTY CHOICE COVERAGE FORM**

. . . .

**E.      LOSS PAYMENT AND VALUATION CONDITIONS**

Covered property will be valued at either Replacement Cost or Actual Cash Value, as stated in the Property Choice Declarations and as described below except for the items listed below in item 3. Specific Property Valuations.  We will not pay more than your financial interest in the lost or damaged property.

**1.      Replacement Cost**

In the event of covered loss or damage, we will determine the value of Covered Property at the actual amount spent to repair, replace or rebuild the damaged property as of the time of the loss or damage, at the same site or another site, subject to the following:

**a.**      We will not pay more for lost or damaged property than the least of:

**(1)**      The Limit of Insurance applicable to the lost or damaged property;

**(2)**      The amount it should cost to replace, on the same premises, the lost or damaged property with other property:

**(a)**      Of comparable material and quality; and

**(b)**      Used for the same purpose; or

**(3)**      The amount you actually spend that is necessary to repair or replace the lost or damaged property with other property:

**(a)**      Of comparable material and quality; and

**(b)**      Used for the same purpose.

. . . .

**b.** We will pay on an Actual Cash Value basis until the lost or damaged property is actually repaired, rebuilt or replaced.

**c.** If you do not repair, replace or rebuild on the same site or another site within 2 years of the date of loss, we will pay you on an Actual Cash Value basis.

[Doc. 65, at 99-100]