RIPPLE, Circuit Judge,
dissenting.
The majority reaches the conclusion that Ms. Perez’s claim of discriminatory discharge should reach the jury by abandoning the procedural constructs and the substantive standards that have long governed our review of discrimination cases. I believe that, when properly applied, these *712 cornerstones of our jurisprudence lead to the conclusion that, as a matter of law, Ms. Perez cannot establish a claim for intentional discrimination. I therefore respectfully dissent.
A.
Beginning, as did the majority, with the indirect method, Ms. Perez bears the initial burden of establishing a prima facie case of discrimination by showing that a similarly situated employee outside her protected class committed a similar infraction and was treated less harshly. Lucas v. Chicago Transit Auth., 367 F.3d 714, 728 (7th Cir.2004). The similarly situated employee does not have to be identical, but, to meet her burden, Ms. Perez must point to an employee who is similar to her in all material respects. “A meaningful comparison is one which serves ‘to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination.’ ” Argyropoulos v. City of Alton, 539 F.3d 724, 735 (7th Cir.2008) (quoting Humphries v. CBOCS W., Inc., 474 F.3d 387, 405 (7th Cir.2007)); see also Good v. Univ. of Chi. Med. Ctr., 673 F.3d 670, 675-76 (7th Cir.2012). “In disciplinary situations, we have further interpreted this part of the test as requiring a showing that the two employees dealt with the same supervisor, were subject to the same workplace rules, and engaged in similar conduct, but nonetheless received disparate treatment for no apparent legitimate reason.” Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939-40 (7th Cir.2003).
Ms. Perez, a Thorntons retail store manager, proposes to meet this burden by comparing herself to her supervisor and store general manager, Don Koziol. She contends, contrary to the facts she admitted in her Local Rule 56.1 statement and discussed in her opposition to summary judgment, that she and Koziol were disciplined by the same decisionmaker. She also maintains that her action of purchasing candy bars for herself at a steep discount and causing a loss to Thorntons is essentially the same conduct as Koziol’s action of making up a loss by using personal funds to pay full price for missing alcohol. Faithful adherence to the principles in our established case law precludes our acceptance of these arguments.
1.
First, Ms. Perez cannot now allege that she and Koziol were disciplined by the same decisionmaker because she is bound by the admissions that she made in her Local Rule 56.1 statement. In its Local Rule 56.1(a) statement of undisputed facts, Thorntons stated that Darlington made the decision to fire Ms. Perez and that “Darlington played no role in Picone’s discipline decision regarding Koziol’s June and July 2009 beer purchase.” R.59 ¶¶ 41, 45 (Defendant’s Statement of Undisputed Facts). Ms. Perez’s Local Rule 56.1(b) statement in response did not dispute these facts, see R.62 ¶¶ 41, 45, thus they are deemed admitted, N.D. Ill. L.R. 56.1(b)(3)(C) (“All material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party.”); see also Adams, 324 F.3d at 937 (“accepting as true the material facts submitted by Wal-Mart that Adams did not properly contest”). The district court correctly relied on the Local Rule 56.1 statements in ruling on the summary judgment motion, see Koszola v. Bd. of Educ., 385 F.3d 1104, 1109 (7th Cir.2004) (“[A] district court is entitled to decide the motion based on the factual record outlined in the [Local Rule 56.1] statements.” (internal quotation marks omitted)), and, in relying on those statements, correctly determined that the *713 difference in decisionmaker was one of the confounding variables that prevented an adequate comparison between Koziol and Ms. Perez, see Ellis v. United Parcel Serv., Inc., 523 F.3d 823, 826 (7th Cir.2008) (“So, to be similarly situated, a manager must have been treated more favorably by the same decisionmaker....”). At this stage, we are not at liberty to look beyond Ms. Perez’s admissions in her statement. See Koszola, 385 F.3d at 1109 (“[0]ur de novo review of [the district court’s] grant of summary judgment will likewise rest only on the [defendant’s] Local Rule 56.1(a) statement and [the plaintiff’s] Local Rule 56.1(b) response.”).[3]
Second, although Ms. Perez and Koziol both violated store policies and each’s conduct was categorized generally as a *714 problem with “inventory control,” the underlying facts of each situation were vastly different. Koziol noticed missing inventory and used his personal funds to make up for any loss to the employer. Ms. Perez created, loss for the employer by selling inventory to herself at a steep discount. She does not dispute that Dar-lington fired her for marking down and purchasing the candy without approval, R.62 ¶ 42, or that “Picone did not discharge Koziol because Koziol paid full retail value for the alcohol,” id. ¶45. The majority takes the view that a jury may perceive Koziol’s actions to be on par with those of Ms. Perez, and that, therefore, we must send this case to the jury. See Maj. Op. at 704-05. Respectfully, our case law requires another approach. “We have repeatedly said we do not sit as a super-personnel department to determine which employment infractions deserve greater punishment. It is enough that the misconduct that led to the adverse job action in question is sufficiently distinct to render the proposed comparators not similarly situated.” Harris v. Warrick Cnty. Sheriff’s Dep’t, 666 F.3d 444, 449 (7th Cir.2012) (citation omitted). Darlington was entitled to conclude that Ms. Perez’s conduct, which resulted in an actual loss to the company, was materially different from Koziol’s conduct, which had no such effect. The mere fact that both might, in the most general sense, be given the generic label of “inventory control” does not mean that Thorntons was required to characterize them in that manner and to address them in the same way. Thorn-tons was entitled to assess the conduct of Koziol and that of Ms. Perez in terms very different from the second-guess of the majority. It was entitled to regard Ms. Perez’s action as pilferage of company assets and Koziol’s as involving no such loss but constituting poor managerial judgment. An employer is free to respond to dissimilar conduct in different ways, cf. Adams, 324 F.3d at 940 (concluding that a situation involving an employee who ate another employee’s pudding was “significantly different” from a situation where an employee allegedly stole $12.65 from another employee), and such an approach does not suggest an invidious motive.[4]
2.
Even if Ms. Perez had met her burden by pointing to a similarly situated employee, she fails to point to evidence showing that Thorntons’ legitimate, non-discriminatory business reason for her termination— that Ms. Perez’s policy violation caused a loss to the company — was pretextual. To rebut an employer’s legitimate, non-discriminatory reason for an employment decision, the plaintiff must point to evidence tending to show that the employer’s reason is a lie, not just that the employer’s evaluation was incorrect. Naik v. Boehringer Ingelheim Pharm., Inc., 627 F.3d 596, 601 (7th Cir.2010); Kariotis v. Navistar Int’l Transp. Corp., 131 F.3d 672, 677 (7th Cir.1997). To show pretext, the plaintiff must do more than assert that “a jury could disbelieve” the reason proffered by the employer. Johnson v. Hondo, Inc., 125 F.3d 408, 415 (7th Cir.1997); cf. EEOC v. G-KG, Inc., 39 F.3d 740, 746-47 (7th Cir. *715 1994) (noting that a plaintiff “could not ... have gotten to the jury if his only ‘evidence’ had been that the defendants’ witnesses were not worthy of belief’). Rather, she “must point to evidence suggesting that [the employer] itself did not honestly believe that explanation.” Giannopoulos v. Brack & Brock Confections, Inc., 109 F.3d 406, 411 (7th Cir.1997); see also Adams, 324 F.3d at 939-40 (“It was up to Adams to produce evidence showing that Wal-Mart did not genuinely believe that she had lifted the $12.65.”). In making this showing, “stray remarks” usually are insufficient to establish pretext unless “those remarks are made by the decision-maker or one having input in a decision, and are made (1) around the time of, and (2) in reference to, the adverse employment action complained of.” Merillat v. Metal Spinners, Inc., 470 F.3d 685, 694 (7th Cir.2006) (internal quotation marks omitted).
Here, the only evidence in support of Ms. Perez’s claim that Darlington was lying about the reason behind his decision to terminate her is that, in November 2008, approximately one year before Ms. Perez was terminated, she told Darlington that Koziol had told her that Koziol does not like to work with women. This single comment, removed temporally from the termination decision and by someone who did not participate in the decision, is simply not sufficient to show that Darlington’s testimony was a lie. Ms. Perez speculates that the year-old comment “tainted” Dar-lington’s decision, but she points to no evidence suggesting that Koziol had the slightest influence over Darlington or that Darlington harbored his own discriminatory views. The fact that a jury could disbelieve Darlington is not sufficient. See Johnson, 125 F.3d at 415.
The majority suggests that, although the passage of time “might lessen th[e] eviden-tiary punch” of these remarks, it “does not make them inadmissible.” Maj. Op. at 710. However, “remarks unrelated to the employment decision in question may not overcome summary judgment if they stand alone as evidence of the employer’s discriminatory intent.” Huff v. UARCO, Inc., 122 F.3d 374, 385 (7th Cir.1997). It is undisputed that Koziol’s remarks allegedly were made and reported to Darling-ton one year prior to Darlington’s decision to terminate Ms. Perez’s employment. Koziol’s remarks, therefore, as a matter of law, cannot suffice to establish pretext.
The majority posits, however, that these remarks do not stand alone — that they must be evaluated in light of the difference in punishment meted out against Koziol for his inventory infraction and Ms. Perez for hers. However, nothing about the disparity in punishment suggests that Thorntons’ proffered reason for terminating Ms. Perez’s employment — that her actions resulted in actual economic loss to the company — was a lie. The majority criticizes Thorntons’ approach because, in its view, Koziol’s scheme was more detrimental to the company; according to the majority, Koziol’s actions “risked future economic loss.” Maj. Op. at 711. Therein, however, the majority validates the distinction Thorntons drew. Koziol’s actions, at some point in the future, may have, but as of yet had not, affected Thorntons’ bottom line. Ms. Perez’s actions had. Indeed, Darling-ton testified to just this distinction:
[Darlington]: There’s only one reason why Don [Koziol] did not get terminated.
Q[uestion]: And that is what?
[Darlington]: Because he put, personally, on his credit card and not created a shortage for Thorntons.
R.60-4 at 19 (Darlington Dep. 94).
B.
Ms. Perez’s effort to set forth a claim under the direct method suffers from *716 similar infirmities. A case under the “direct” method may rely on circumstantial evidence, but “[t]hat circumstantial evidence[ ] ... must point directly to a discriminatory reason for the employer’s action.” Adams, 324 F.3d at 939. It is not sufficient that a jury might guess or speculate that gender or “race might have made a difference in the decision,” because “guesswork and speculation are not enough to avoid summary judgment.” Good, 673 F.3d at 675. “[Tjhere must be a real link between the bigotry and an adverse employment action.” Gorence v. Eagle Food Ctrs., Inc., 242 F.3d 759, 762 (7th Cir.2001) (noting that a statement such as, “Old women are hard to deal with,” without more, does not show intentional discrimination). The court views the evidence in the light most favorable to the plaintiff and makes reasonable inferences therefrom, but reasonable inferences do not include every possible inference, only those supported by the record. Overly v. KeyBank Nat’l Ass’n, 662 F.3d 856, 863 (7th Cir.2011).
As with the indirect method, stray remarks do not point directly to discrimination unless the decisionmaker or one with input in the decision made the comment around the time of, or in reference to, the adverse employment action. Id. at 865. “Further, the ‘statements of a person who lacks the final decision-making authority may be probative of intentional discrimination,’ but only ‘if that individual exercised a significant degree of influence over the contested decision.’ ” Nichols v. S. Ill. Univ.-Edwardsville, 510 F.3d 772, 782 (7th Cir.2007) (quoting Sun v. Bd. of Trs. of Univ. of Ill, 473 F.3d 799, 813 (7th Cir.2007)).
Ms. Perez’s circumstantial evidence that Darlington was motivated by gender or race animus consists of the following: In 2008, Darlington transferred Ms. Perez to give her experience at a higher level store. When Ms. Perez met Koziol, Koziol told her that he did not like to work with women; in response, Ms. Perez reported this statement to Darlington and requested to be moved back to her former position. Darlington told Ms. Perez that Ko-ziol’s store was the only opening and that she could work there or leave the company. One year later, in November 2009, Darlington conducted an investigation into Ms. Perez’s manual override of the price of a large number of candy bars. Darlington, after consultation with Roberts (from human resources), met with Koziol about the override, who denied knowing about the override or giving permission to conduct the override. Darlington, with Roberts conferenced in by telephone, then met with Ms. Perez, who claimed that Koziol gave her permission to perform the override. After Ms. Perez departed, Darlington spoke with Roberts and expressed his desire to terminate Ms. Perez’s employment; Roberts agreed with that decision.
Here, the employment action was taken by Darlington, in consultation with Roberts. There is no evidence in this record that Darlington or Roberts ever harbored an insidious motive.[5] In order to prevail, Ms. Perez not only must tie Koziol’s sexist statements to Darlington, but establish that Koziol’s alleged sexism infected Dar-lington’s decision to terminate Ms. Perez’s employment. Ms. Perez’s direct evidence *717 case relies, therefore, on the force and effect that Koziol’s discriminatory statement had on Darlington’s decision nearly one year after it was made. We have held that if discriminatory “remarks are not contemporaneous with the discharge or causally related to the discharge decision making process, they are insufficient to create a triable issue of material fact regarding discrimination.” Oest v. Illinois Dep’t of Corr., 240 F.3d 605, 611 (7th Cir.2001) (internal quotation marks omitted). Had Ms. Perez’s discharge been based on a potentially false report by Koziol shortly after he made a known, derogatory statement about women or Hispanic employees, then there might be a triable issue of fact. That is not the situation we have here. Here, taking the evidence in the light most favorable to Ms. Perez, Darlington had knowledge of only one discriminatory comment by Koziol, and there was no temporal or causal connection between that remark and her discharge. Under our case law, such a remark does not raise the spectre of discrimination, and Darlington was entitled to conclude similarly in making his termination decision.
Ms. Perez’s case also cannot be saved under the “cat’s paw” theory. “The cat’s paw theory applies in the employment discrimination context when a biased subordinate who lacks decision-making power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.” Johnson v. Koppers, Inc., 726 F.3d 910, 914, 2013 WL 4022294, at *3 (7th Cir. Aug. 8, 2013) (internal quotation marks omitted). The cat’s paw theory, however, cannot be employed to impute a discriminatory motive to an unbiased decisionmaker when the “decisionmaker conducts a meaningful and independent investigation of the information being supplied by the biased employee.” Schandelmeier-Bartels v. Chi. Park Dist., 634 F.3d 372, 383 (7th Cir.2011). Here, there is no question that Darlington both viewed the video of Ms. Perez conducting the override and interviewed Ms. Perez in person concerning her actions.
In sum, this record does not contain circumstantial evidence that “point[s] directly to a discriminatory reason for the employer’s action.” Adams, 324 F.3d at 939. The district court, therefore, did not err in concluding that Ms. Perez had failed to establish a discriminatory discharge under the direct method.
C.
The approach employed by the majority does not simply force Thorntons to defend a discrimination claim that has no basis in fact. It creates serious ambiguity, and instability, into settled law. It will encumber, substantially, the work of both the bench and bar in this frequently litigated area.
This decision signals the end of Rule 56.1 statements as an effective means of narrowing the factual issues before the district courts. If appellate panels are free to look beyond these statements to determine if parties have raised genuine issues of material fact, then litigants will not take seriously their obligations under Rule 56.1, and the district courts will lose an important tool for “organizing the evidence and identifying disputed facts,” FTC v. Bay Area Bus. Council, Inc., 423 F.3d 627, 633 (7th Cir.2005), and instead will be “obliged ... to scour the record looking for factual disputes,” Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 922 (7th Cir.1994).
Stray remarks, even those of ancient vintage and not in any way attributable to the decisionmaker, will now result in employer accountability. Similarly, the “cat’s paw” theory of employer liability has been cut loose from its logical and experiential *718 moorings to become a virtual engine of destruction of good-faith efforts to administer a fair employee disciplinary system. After today’s decision, if it remains the law of the circuit, an employer can no longer act with the confidence that he has obeyed the law if he treats similarly situated individuals similarly in disciplinary matters. His assessment of the similarity of employee conduct in the real-world circumstances of the workplace will now be subject to appellate court recharacterization at a meaningless level of abstraction. The Supreme Court has stated that we must “ensure that Title VII does not become a ‘general civility code.’ ” Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). When the remarks of an employee, made approximately one year prior to a termination decision, can be imputed to an employer and used as a basis for Title VII liability, however, employers will have no choice but to put into place and rigorously enforce just such a code.
This case, if decided under the established norms of this court’s jurisprudence, would pose no extraordinary question of law and would yield no novel principle or unique methodology to disturb the established expectations of the practicing bench and bar. Unfortunately, today’s opinion takes a different course. Its interpretation of established law and the methodology it sanctions will have, I fear, a jarring effect on the bench and bar of the circuit. It will unduly confuse and complicate the tasks of those who judge, litigate and counsel in this important area of discrimination law. Accordingly, I respectfully dissent.

. The majority spends several pages explaining why, despite Ms. Perez’s failure to "respond ... as clearly as she should have” to Thorntons’ Rule 56.1 statement, the court nevertheless should look beyond that failure in determining whether the district court erred in granting summary judgment. Maj. Op. at 705-06.
With respect, I disagree with my colleagues on one matter of record: Ms. Perez did not simply fail "to respond ... as clearly as she should have” to Thorntons' statements regarding who made the decisions to terminate her employment (Darlington) and to discipline Koziol (Picone). Ms. Koziol did not dispute these facts at all in her responsive statement. Moreover, in her brief in opposition to Thorntons' motion for summary judgment, she affirmatively identified Darlington as the decisionmaker who made the decision to terminate her employment. See R.61 at 5 ("Here, we have Darlington, the decision-maker .... ”); id. (“Mr. Darlington fired her....”).
I also cannot agree with my colleagues that the record evidence contradicts Thorntons' "assertions that Darlington played no role in Picone’s decision to discipline but not fire Koziol and that Picone played no role in the decision to fire Perez.” Maj. Op. at 706 (emphasis added). The exchange that the majority recounts on pages 14-16 of its opinion begins, as identified in Thorntons' Rule 56.1 statement ¶ 43, on page 88 of Darlington’s deposition, with the following set of questions:
Q Did you, yourself, investigate the circumstances of [Koziol's] situation?
A I was involved in the investigation.
Q Okay. What part did you play?
A I accompanied Sam Picone when he went to the store to get Don's statement.
Q When you say "get Don’s statement,” do you mean a written statement?
A No, just orally.
Q That happened in the office?
A At Store 301, yes.
Q With just the three of you?
A Yes. R.60-4 at 17 (Darlington Dep. 88). Darlington could speak with authority as to what transpired during the investigation of Koziol because he was present when it occurred and, perhaps, although it is not entirely clear, participated in the questioning of Koziol. None of the testimony that follows, which details Koziol's statement and the actions that ensued, contradicts Thorntons’ assertion in its Rule 56.1 statement that "Darlington played no role in Picone’s discipline decision regarding Koziol’s June and July 2009 beer purchase_” R.59 ¶ 45 (emphasis added). Indeed, that may have been the reason that Ms. Perez did not contest the fact in the district court.
In the end, the majority’s effort to tease out of the record a genuine issue of triable fact not asserted in the Rule 56.1 statements proves too much. Indeed, its effort demonstrates the value of Rule 56.1 in "clarifying] and sharpening]” the issues for the court’s consideration. Maj. Op. at 705-06.
[Local Rule] 56.1 and similar rules assist the district court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence.” Bordelon v. Chi. Sch. Reform Bd. of Trs., 233 F.3d 524, 527 (7th Cir.2000) (citation omitted). It is not the duty of the district court to scour the record in search of material factual disputes, nor is it ours.
Roger Whitmore’s Auto. Servs., Inc. v. Lake County, Ill., 424 F.3d 659, 664 n. 2 (7th Cir.2005). Ms. Perez failed to comply with the local rules, and, in an effort to make her case for her, the majority, in derogation of Rule 56.1, has scoured the record in a futile search for factual disputes.

. I also note that Ms. Perez fails to point to any evidence suggesting that she and her supervisor had the same roles, were subject to the same discipline standards and were subject to the same workplace rules. The little record evidence on this topic suggests that they had different roles and were subject to at least some differing rules. See R.60-5 at 12 (Perez Dep. 44) (noting that Koziol set the work schedule for the store); id. at 14 (Perez Dep. 54-55) (noting that Koziol had a more flexible work schedule); R.60-4 at 33 (Dar-lington Dep. 52) (same). Thorntons, however, did not offer these differences as a basis for the more severe discipline imposed upon Ms. Perez.

. The majority emphasizes that Darlington knew of Koziol’s bias against women employees because of Koziol's year-old statement. From that knowledge, without any evidence that Darlington shared that bias, the majority holds it is entirely appropriate to assume that Darlington shared Koziol’s bias and acted on it. It fails to address why it is not just as likely — and perhaps more likely — that a senior manager, knowing of a subordinate’s bias, would take that bias into account in assessing the subordinate's account of the transaction.