In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 20-2831

CODY CHRISTOPHERSON,

*Plaintiff-Appellant,*

*v.*

AMERICAN STRATEGIC INSURANCE CORPORATION,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:19-cv-00202-JPS — **J. P. Stadtmueller**, *Judge.*

_____

ARGUED FEBRUARY 12, 2021 — DECIDED JUNE 3, 2021

_____

Before RIPPLE, HAMILTON, and ST. EVE, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff Cody Christopherson
has appealed from a grant of summary judgment in favor of
his home insurance company, defendant American Strategic
Insurance Corporation, known as ASI. We affirm. In the sum-
mer of 2018, two trees fell on plaintiff's home, three months
apart, resulting in its total destruction. The undisputed facts
show that the insurer paid all sums owed to plaintiff, includ-
ing the policy limits for total destruction of his home and all

other claims that he submitted with documentation for costs actually incurred.

I.  *Factual and Procedural Background*

   A.  *The Falling Trees and Plaintiff's Insurance Claims*

Because plaintiff Christopherson appeals from a grant of summary judgment, we must view the evidence in the light reasonably most favorable to him and give him the benefit of conflicts in the evidence. *Greengrass v. Int'l Monetary Systems Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015). Accordingly, we do not vouch for the objective truth of every fact that we must assume to be true for purposes of the appeal. *KDC Foods, Inc. v. Gray, Plant, Mooty, Mooty & Bennett, P.A.*, 763 F.3d 743, 746 (7th Cir. 2014).

   1.  *June 5: The First Tree Falls*

On June 5, 2018, a tree fell on plaintiff's house. That same day, he notified his insurer, ASI. The damage occurred during the policy year that ran from August 7, 2017 through August 7, 2018. The 2017–18 policy covered up to $129,000 in damages to the dwelling, $64,500 in damages to personal property, and $12,900 for loss of use, also referred to as additional living expenses.

On June 6, the insurer sent independent claims adjuster Chris Holzem to inspect plaintiff's property. Holzem found that the house was uninhabitable as a result of damage to the roof, plywood sheathing, and a sewer vent pipe. Plaintiff then contacted the insurer to ask about receiving payments to cover additional living expenses. The insurer's claims adjuster, Michael Ortega, responded that plaintiff should first provide the insurer with receipts for any such expenses incurred. The 2017–18 policy provided that if a covered loss

caused the insured's residence to become uninhabitable, the insurer would cover any necessary increase in living expenses he incurred to maintain his normal household standard of living, up to a limit of $12,900.

Based on Holzem's estimate, the insurer determined that the actual cash value of the damage the first tree caused to plaintiff's house was $6,695. The replacement cost was slightly more: $6,829. The 2017–18 policy provided that the insurer would "pay no more than the actual cash value of the damage until actual repair or replacement is complete." On July 6, the insurer paid plaintiff $11,081. That sum included the replacement cost of $6,829, plus a tree-removal fee and miscellaneous costs for emergency services and tarps. Ortega notified plaintiff of the payment in an email that day, and he again reminded plaintiff that the insurer would require receipts for additional living expenses.[1]

On July 16, an independent adjuster hired by plaintiff, Keye Voigt, notified the insurer's Ortega that plaintiff had been displaced from his home and needed additional living expenses. Voigt offered to email plaintiff's receipts to the insurer, but the record does not include evidence that either Voigt or anyone else actually sent any such receipts to the insurer.

In July 2018, plaintiff hired an independent investigator, Brian Hintze, to estimate the cost of repairing the roof damage caused by the first tree. Hintze's estimate was $37,515. Plaintiff did not provide Hintze's report to the insurer until December 2018, months after the second tree had fallen and the

---

[1] In December 2018, the insurer also paid plaintiff $2,557 to repair water damage that had been part of his June 5 claim.

house was already a total loss. Plaintiff never carried out the repairs Hintze had proposed.

On August 1, Voigt again emailed the insurer requesting additional living expenses on behalf of plaintiff, as well as payment for emergency services, installation of tarps, and tree removal. The next day, the insurer's claims adjuster, Susan Rochford, responded to Voigt's email and explained that the insurer had already paid plaintiff for the stated losses. She asked Voigt to call her back regarding the additional living expenses.

On August 7, plaintiff's 2017–18 policy expired and the 2018–19 policy became effective. The 2018–19 policy offered slightly more coverage than its predecessor: up to $135,000 for damage to the dwelling, $67,500 in damages to personal property, and $13,500 for additional living expenses.

Also on August 7, Voigt returned Rochford's call. Armed with Hintze's estimate—which, recall, the insurer did not know about at the time—Voigt told her that plaintiff's entire roof needed to be replaced. Rochford responded that the insurer would send an engineer to assess the damage.[2] Voigt also expressed frustration that, up to this point, the insurer had not paid plaintiff's additional living expenses. Again, at that time, neither Voigt nor plaintiff had submitted receipts for costs incurred for additional living expenses.

On August 17, the insurer began advancing additional living expenses to plaintiff. In all, the insurer paid him $26,037 for additional living expenses, exhausting the limit under the

---

[2] The insurer's structural engineer completed his damage report on August 23. The second tree fell on August 28, and the insurer did not act on that report.

2017–18 policy, and all but $363 under the limit of the 2018–19 policy.[3]

### 2. *August 28: A Second Tree Falls*

On August 28, a second tree fell on plaintiff's house. He notified the insurer on August 30. On November 21, the Village of Richfield issued an Order to Raze and Remove Buildings from plaintiff's property by January 5, 2019. The Order was authorized by Wisconsin Statute § 66.0413(1)(b)(1), which empowers local governments to order an owner to raze a building that is "dangerous, unsafe, unsanitary, or otherwise unfit for human habitation and unreasonable to repair." See also § 66.0413(1)(c) (establishing presumption of unreasonableness to repair in certain circumstances, including when repair costs would exceed 50 percent of building value).

On December 4, 2018, plaintiff's adjuster Voigt submitted to the insurer: (i) a summary-of-loss sheet estimating the loss caused by the August 28 tree fall at $141,454; (ii) Hintze's $37,515 estimate for repairing the roof after the first tree's damage; (iii) a tree-removal invoice totaling $1,500; (iv) a demolition proposal totaling $6,884; (v) an invoice for fire and water restoration totaling $1,448; and (vi) the Raze Order. After accounting for payments already made under the 2017–18 policy, plaintiff demanded $130,126 under the 2018–19 policy.

The insurer did not provide plaintiff with the requested demolition payment by the January 5, 2019 deadline for razing the house, so he razed the house by himself. He did not

---

[3] The insurer did not provide any payments to plaintiff for additional living expenses for the period of June 5 through August 16, 2018.

provide the insurer with invoices for the cost of razing his house, including any claims for his own labor.

B. *Plaintiff Files Suit*

On January 9, 2019, plaintiff Christopherson filed suit in state court against insurer ASI alleging breach of contract and bad-faith denial of policy benefits. Plaintiff alleged that the insurer had wrongfully delayed investigating his claims and, as of the time the complaint was filed, had refused to pay his claims. The insurer removed the case to federal court based on diversity jurisdiction.

On February 27, plaintiff's counsel sent an email to the insurer's counsel stating that, excluding the personal property losses and additional living expenses that had yet to be determined, plaintiff's "undisputed losses" amounted to $143,384. This amount included the $135,000 dwelling coverage limit under the 2018–19 policy, as well as the $6,884 demolition estimate, and the $1,500 invoice for tree removal.

On March 8, the insurer's counsel notified plaintiff's counsel that the insurer would pay the requested $143,384. The insurer's counsel noted, however, that the insurer had not yet received any notice of claims for damage to personal property, and he requested documentation of the nature or extent of any such claims. The record does not reflect that plaintiff ever submitted a claim for damage to personal property.[4]

That payment did not end the lawsuit. A slew of discovery requests, motions for protective orders, and court orders

---

[4] Plaintiff first attached an itemized list of unsalvageable personal property to his response to the insurer's later motion for summary judgment. The claimed losses totaled $20,851.

followed. In May 2019, the insurer moved for a protective order denying plaintiff's discovery requests with respect to his bad faith claim. The insurer argued that plaintiff was not entitled to discovery because he could not establish any underlying breach of the insurance policies. The insurer's opposition to discovery relied on *Brethorst v. Allstate Property & Casualty Ins. Co.*, 334 Wis. 2d 23, 798 N.W.2d 467 (2011), which held that an insured could not proceed with discovery on a first-party bad-faith claim unless the insured pleaded a breach of contract by the insurer *and* the court was "satisfied" that the insured had either established a breach or could do so in the future. *Id.* at 28–29, 798 N.W.2d at 470.

The insurer's theory was simple: to allege breach of the policies, plaintiff had to allege a wrongful denial of benefits, but he could not do so. By then, the insurer had already paid the full limits of the 2018–19 policy, plaintiff's claims under the 2017–18 policy, and his additional living expenses under both policies. Payment of those benefits, the insurer reasoned, foreclosed any claim for breach.

The district court granted the insurer's motion. Delay, the court explained, could not form the basis of a breach of an insurance policy under *Brethorst*, and plaintiff had failed to cite any authority to the contrary. The court determined that a single material question remained: whether plaintiff could prove any breach by the insurer. So far, the court concluded, plaintiff had not shown that he could.

Plaintiff moved to reconsider on the discovery issue. The court denied his motion. The insurer then moved for summary judgment. Its motion was brief, but its brevity was not unwarranted. By that time, the court was well acquainted with the parties' positions.

In opposing summary judgment, however, plaintiff completely changed his tune. For the first time, he attempted to argue breach of contract. He identified six policy provisions that the insurer had allegedly breached and seven disputed material facts that he said precluded summary judgment. He argued that the insurer breached the 2017–18 policy by failing to pay: (i) $37,515 for roof reconstruction (the Hintze estimate); (ii) $2,580 for damage to siding, roofing, and windows; and (iii) additional living expenses between June 5 and August 16, 2018. He also argued that the insurer breached the 2018–19 policy by failing to pay $13,500 in demolition expenses after the Raze Order was issued. Finally, he argued that the insurer breached both policies by failing to pay $20,851 for damage to personal property.

In its reply brief, the insurer addressed plaintiff's new arguments. With respect to the Hintze estimate for roof repair, the insurer pointed out that plaintiff had never completed the suggested reconstruction. (That was not surprising since the house was wholly destroyed by the second tree just a couple of weeks after the estimate was prepared.) The insurer argued that under the 2017–18 policy, without proof of repair or replacement, recovery was limited to the actual cash value of the damage, which it had already paid. The insurer applied similar logic to plaintiff's claims that he was owed $2,580 for damage to siding, roofing, and windows, and $13,500 for demolition expenses. The key phrase in the cited policy provisions, the insurer emphasized, was insurance coverage for "cost you incur." Because plaintiff had not presented evidence of costs actually incurred but not paid by the insurer, he could not show a breach.

On the claim for additional living expenses, the insurer offered two responses. First, plaintiff still had not submitted receipts for any expenses incurred between June 5 and August 16, 2018. Second, he could not establish *wrongful* denial of benefits when he had nearly exhausted the limits under both annual policies.

Finally, on plaintiff's claim that the insurer failed to compensate him for personal property losses, the insurer noted simply that such a claim had never been made. While plaintiff did report water damage on December 12, 2018, he had not provided the required inventory of damage to personal property until he filed his response to the motion for summary judgment—over a year after his initial report of water damage.

The district court granted summary judgment. The court agreed with the insurer's basic point, that its core obligation under both policies was to pay for expenses as plaintiff incurred them and supplied proof. The undisputed facts could not support a claim of breach, let alone bad faith. This appeal followed.

## II. *Analysis*

Plaintiff's arguments have shifted somewhat on appeal but still have little merit. First, he argues that the *Rooker-Feldman* doctrine requires remand to state court for lack of federal jurisdiction. Second, he argues that the insurer unfairly raised new arguments in its reply brief in the district court, depriving him of a fair opportunity to respond. Third, he insists that lingering factual disputes should have precluded summary judgment. We address each argument in turn.

A.  *The Rooker-Feldman Doctrine*

The *Rooker-Feldman* doctrine bars lower federal courts from exercising what would effectively be appellate jurisdiction over final state-court judgments. *Lance v. Dennis*, 546 U.S. 459, 463 (2006). It is "a narrow doctrine, confined to 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Id.* at 464, quoting *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005).

Our account of the facts includes no mention of any state-court judgment against either of these parties. That silence might leave the reader wondering what *Rooker-Feldman* has to do with this case, let alone why a federal *plaintiff* would invoke it. We have also wondered. The answers are nothing and for no good reason. Plaintiff answers by asserting that the village's Raze Order was a final and unappealed state-court judgment. The assertion misunderstands the basics of *Rooker-Feldman*. First, the Raze Order issued by the village was not a state-court judgment but an "administrative order of a municipal building inspection department directing the razing of a [destroyed] building." See *Gambrell v. Campbellsport Mutual Ins. Co.*, 47 Wis. 2d 483, 490, 177 N.W.2d 313, 316 (1970). Second, plaintiff was not a state-court loser. Third, in this insurance dispute, the Raze Order was a given for both sides; neither side claimed to be hurt by it or challenged it in any way. The *Rooker-Feldman* doctrine simply does not apply.

B.  *The Insurer's Alleged Gamesmanship*

Plaintiff points out that we and other courts are critical of parties who raise new arguments in reply briefs that should have been raised in opening briefs. The general point is correct. We strongly discourage the type of gamesmanship he describes. See, e.g., *Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 665 (7th Cir. 2005) (declining to reach plaintiffs' argument "because its appearance for the first time in [their] reply brief means that it is waived"); *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 586 (7th Cir. 1999) ("Even if the point had been preserved, [plaintiff] failed to develop it until her reply brief, which again is a day late and a dollar short."); *Cornucopia Institute v. U.S. Dep't of Agriculture*, 560 F.3d 673, 677–78 (7th Cir. 2009) (same). In the typical case, a six-page motion for summary judgment followed by a fifteen-page reply brief would raise eyebrows. But this is not the typical case. And plaintiff was certainly not, as he claims, "blindsided."

Plaintiff concedes that the insurer raised new defenses in its reply only because he raised entirely new arguments in his opposition to summary judgment. Until his response, plaintiff had not identified a single alleged breach of a policy provision, despite many opportunities to do so and repeated warnings from the district court that failure to do so would result in dismissal. His cries of gamesmanship complain about the effects of his own tactics. If he lacked the chance to rebut the insurer's reply, it was his own fault.

Plaintiff argues, though, that we should overlook the tactical problems and allow him to state his case with new arguments on appeal. He argues that, as a matter of law, he is entitled to the maximum policy limits of *both* annual policies added together. His theory seems to be that he should be paid

twice for the total destruction of one home. This imaginative
theory was forfeited, and even if we were inclined to overlook
the forfeiture, plaintiff seeks an absurd application of Wiscon-
sin law.

A raze order, such as the one at issue here, triggers Wis-
consin's "valued policy law." Wis. Stat. § 632.05. The "valued
policy" statute provides in relevant part:

> Whenever any policy insures real property that
> is owned and occupied by the insured primarily
> as a dwelling and the property is wholly de-
> stroyed, without criminal fault on the part of the
> insured or the insured's assigns, the amount of
> the loss shall be taken conclusively to be the pol-
> icy limits of the policy insuring the property.

Wis. Stat. § 632.05(2). Under that statute, the insurer paid
plaintiff the applicable limit under the policy in effect at the
time the Raze Order was issued: $143,384 under the 2018–19
policy.[5] By asking the court to award the applicable limit un-
der the 2017–18 policy, as well, plaintiff essentially argues that
the insurer breached his two policies by not paying him twice
for the destruction of one home. Suffice it to say that the the-
ory is not viable.

C. *Whether Factual Disputes Preclude Summary Judgment*

Plaintiff also argues that the insurer remains in breach of
both policies for failing to pay several claims: (i) the $37,515
Hintze estimate; (ii) additional living expenses for the time

---

[5] To date, the insurer has paid plaintiff $183,307. It paid a total of
$13,886 under the 2017–18 policy, $143,384 under the 2018–19 policy, and
$26,037 in additional living expenses under both policies.

from June 5 to August 16, 2018; (iii) lost personal property valued at $20,851; and (iv) unspecified compensation for labor costs associated with demolishing his house. The undisputed facts defeat all of these specific claims.

Plaintiff's argument misses the fundamental point of the policies' provisions involving reimbursement: the insured must *first* incur the expenses and *then* provide the insurer with documentation before the insurer is obliged to pay. By his own admission, plaintiff never carried out the roof reconstruction for which Hintze estimated the costs. Before anyone did anything about Hintze's estimate, and before the insurer even knew about it, the second tree fell and wholly destroyed the home. Accordingly, the insurer was obliged to pay only the actual cash value of the damage by the first tree. It fulfilled that obligation on July 6, 2018, when it paid plaintiff $11,081 to cover damages to his roof, tree removal, and other expenses.

Plaintiff also could not be entitled to reimbursement for additional living expenses incurred between June 5 and August 16, 2018 because there is no evidence that he actually incurred such expenses during those weeks. He never submitted such proof to the insurer. And in any event, the insurer paid the limit for additional living expenses under the 2017–18 policy and all but $363 under the limit of the 2018–19 policy. Regardless of when plaintiff believes the insurer should have started paying his additional living expenses, it does not owe him any more.

Plaintiff has also failed to present material factual disputes on his claims for damage to personal property and unspecified labor costs for demolishing his house. Put simply, an insurer cannot breach a policy for failure to pay a claim that the

insured never submitted. It is undisputed that the first time plaintiff notified the insurer of damage to his personal property was in his response to summary judgment. (And at the risk of stating the obvious, a spreadsheet attached to a brief does not qualify as a claim submitted by the insured to the insurer.) It is similarly undisputed that plaintiff never submitted a claim for unpaid labor costs. These arguments, too, do not defeat summary judgment.

The judgment of the district court is AFFIRMED.